No. 21-35374

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

════════════════

**SHAWN SHELTRA,**
*Plaintiff-Appellant,*

*v.*

**JAY CHRISTENSEN, Warden, et al,**
*Defendants-Appellees.*

════════════════

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
CASE NO. 1:20-CV-00215
HON. DAVID C. NYE

════════════════

# APPELLANT'S REPLACEMENT OPENING BRIEF

════════════════

**UCLA SCHOOL OF LAW**
**PRISONERS' RIGHTS CLINIC**
AARON LITTMAN *
385 CHARLES E. YOUNG DRIVE E
LOS ANGELES, CALIFORNIA 90095
(310) 825-9562
LITTMAN@LAW.UCLA.EDU

COUNSEL FOR PLAINTIFF-APPELLANT
**Shawn Sheltra**

* This brief was prepared with the assistance of UCLA School of Law Prisoners' Rights Clinic students Kimberley Macnamara-Hammerton, Ali Massoud, Anna Norkett, and Jack Stephens.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ................................................................................................. 1

JURISDICTIONAL STATEMENT ......................................................................... 2

STATEMENT OF ISSUES PRESENTED ............................................................. 3

STATEMENT OF THE CASE ............................................................................... 4

    I.    Prison officials placed Sheltra in unsafe living conditions. Following prison policy, Sheltra repeatedly communicated his concerns, documenting the ongoing threats to his safety on concern forms, a grievance, and an appeal. The defendants took no protective action. ...................................................................................... 4

        A.    IDOC policy requires prisoners to follow a multi-step procedure to properly exhaust their administrative grievances. ........................................................... 5

        B.    Sheltra verbally communicated his concerns to the defendants, and documented the ongoing threats to his safety on concern forms they reviewed. The defendants took no action to protect him. .................................................... 6

        C.    Sheltra submitted a grievance form that documented informal resolution efforts, reiterated the ongoing threats to his safety, and requested a transfer. The defendants took no protective action in response. ............................................. 8

        D.    Sheltra appealed the denial of his grievance. The defendants then accused him of participating in an extortion ring and briefly placed him in isolation during the pendency of an investigation into their own accusations. ................ 9

        E.    After Sheltra was released from isolation, the defendants left him in jeopardy. Just as Sheltra had foretold, he was attacked. .................................. 10

i

II.  Procedural History ........................................................................... 11

SUMMARY OF THE ARGUMENT .................................................... 12

STANDARD OF REVIEW ................................................................... 14

ARGUMENT ........................................................................................ 14

I.    Sheltra properly exhausted his failure-to-protect claim prior to the April 17
attack. .................................................................................................. 14

   A.  Sheltra's failure-to-protect claim arose prior to the attack. ...................... 15

      1.  The Supreme Court held in *Farmer* that an Eighth Amendment failure-to-protect claim arises when a prison official exposes a prisoner to a substantial risk of serious harm, even if the harm has not yet materialized. 15

      2.  The Ninth Circuit has repeatedly and recently applied this well-settled doctrine. ..................................................................................................... 16

      3.  Applying this binding precedent, the defendants violated Sheltra's Eighth Amendment rights prior to the attack. ........................................................... 19

   B.  Under the continuing violations doctrine, Sheltra was not required to exhaust again after the risk of harm to which the defendants exposed him finally materialized. ................................................................................................. 20

      1.  A unanimous consensus of seven circuits has adopted the continuing violations doctrine, which holds that prisoners need not file successive grievances raising the same issue if the constitutional deprivation is continuing. ................................................................................................ 21

      2.  Multiple district courts in the Ninth Circuit have applied the continuing violations doctrine to disputes regarding the PLRA's administrative exhaustion requirement. ................................................................................ 25

    3.    Sheltra properly exhausted administrative remedies as to the defendant's ongoing failure to protect him. ....................................................................... 26

    C.   The district court's cited authority is misplaced. ....................................... 29

II.   Alternatively, to the extent that post-attack exhaustion was necessary, the grievance process was unavailable to Sheltra in light of prison rules prohibiting successive grievances on the same issue and his incapacitating injuries. ........... 31

    A.   IDOC rules prohibit successive grievances on the same issue. ................ 32

    B.   Sheltra was unable to file a timely grievance because he was blinded, and the defendants refused to accommodate his request to file a late grievance. .. 35

CONCLUSION ..................................................................................................... 39

STATEMENT OF RELATED CASES .................................................................. 40

CERTIFICATE OF COMPLIANCE ...................................................................... 41

CERTIFICATE OF SERVICE .............................................................................. 42

# TABLE OF AUTHORITIES

## Cases

*Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc).............35

*Alexis v. Connors*, No. 18-2099, 2023 WL 4525959............................
  (D.N.J. July 13, 2023) ..................................................22

*Andres v. Marshall*, 867 F.3d 1076 (9th Cir. 2017) ..............................32

*Baker v. Howard*, No. 219CV2617KJMDMCP, 2021 WL 2142734.....
  (E.D. Cal. May 26, 2021) ...........................................18-19

*Becker v. Sherman*, No. 1:16-CV-828 AWI JDP, 2018 WL 4616281 ...
  (E.D. Cal. Sept. 25, 2018) ..........................................25-26

*BNSF Ry. Co. v. Or. Dep't of Revenue*, 965 F.3d 681 (9th Cir. 2020)   14

*Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622 (6th Cir. 2011)........36-37

*Brown v. Valoff*, 422 F.3d 926 (9th Cir. 2005).......................................32

*Bryant v. Fed. Bureau of Prisons*, No. 2:11-CV-00254-CAS, ..............
  2014 WL 2472255 (C.D. Cal. June 2, 2014)...............................25

*Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629 (2d Cir. 2001) ........31

*Carter v. Paramo*, No. 3:17-CV-1833-JAH-AGS,................................
  2018 WL 4579854 (S.D. Cal. Sept. 25, 2018) .............................38

*Cortez v. Skol*, 776 F.3d 1046 (9th Cir. 2015).......................................18-20

*Cox v. Peters*, No. 2:19-CV-00376-AC, 2021 WL 2272926.................
  (D. Or. May 14, 2021).................................................38

*Dalton v. Aulepp*, No. 13-3089-SAC, 2015 WL 728490......................
  (D. Kan. Feb. 19, 2015)..............................................30-31

*Farmer v. Brennan*, 511 U.S. 825 (1994)..............................................15, 16

iv

*Fordley v. Lazarraga*, 18 F.4th 344 (9th Cir. 2021) ............................... 14

*Griffin v. Arpaio*, 557 F.3d 1117 (9th Cir. 2009) .................................... 20

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ......................... 21

*Helling v. McKinney*, 509 U.S. 25 (1993) ............................................. 16

*Howard v. Waide*, 534 F.3d 1227 (10th Cir. 2008) ................................ 21, 23

*Hunter v. Rohrer*, No. 3:18-CV-05198-BHS-JRC, 2021 WL 4067463 . (W.D. Wash. Apr. 21, 2021) ........................................................ 22, 26

*Hurst v. Hantke*, 634 F.3d 409 (7th Cir. 2011) ...................................... 37, 39

*Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004) ................................ 21, 22, 25

*Johnson v. Killian*, 680 F.3d 234 (2d Cir. 2012) ................................... 21, 24

*Jones v. Bock*, 549 U.S. 199 (2007) ...................................................... 36

*Kincaid v. Sangamon Cnty.*, 435 F. App'x 533 (7th Cir. 2011) ............. 37

*Lanaghan v. Koch*, 902 F.3d 683 (7th Cir. 2018) ................................... 37

*Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062 ....................... (9th Cir. 2013) .............................................................................. 17

*Maney v. Brown*, 464 F. Supp. 3d 1191 (D. Or. 2020) .......................... 33

*Marella v. Terhune*, 568 F.3d 1024 (9th Cir. 2009) (per curiam) .......... 32-33

*Millner v. Biter*, No. 113CV02029AWISABPC, 2016 WL 888126 ...... (E.D. Cal. Mar. 9, 2016) ............................................................... 38

*Morgan v. Trierweiler*, 67 F.4th 362 (6th Cir. 2023) ............................ 21, 24-25

*Nunez v. Duncan*, 591 F.3d 1217 (9th Cir. 2010) .................................. 32

*Ollison v. Vargo*, No. 6:11-CV-01193-SI, 2012 WL 5387354 .............
    (D. Or. Nov. 1, 2012) ...................................................37-38

*Owens v. Keeling*, 461 F.3d 763 (6th Cir. 2006) ....................................33

*Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215 (11th Cir. 2010) .21, 24

*Pasion v. McGrew*, No. 10-00443 HG-LEK, 2010 WL 3184518 .........
    (D. Haw. Aug. 11, 2010) ............................................30, 31

*Pennsylvania v. West Virginia,* 262 U.S. 553 (1923) ............................16

*Perry v. Dickinson*. No. 2:10-cv-3223 KJN P, 2012 WL 2559426 ........
    (E.D. Cal. June 29, 2012) ...........................................29-30

*Porter v. Nussle*, 534 U.S. 516 (2002)....................................................20

*Princess Cruises, Inc.*, 306 F.3d 827 (9th Cir. 2002) ............................14

*Reed v. Wash. State Dep't of Corr.*, No. 3:16-CV-05993-BHS-DWC,..
    2021 WL 8086628 (W.D. Wash. Apr. 16, 2021) ........................26

*Ross v. Blake*, 578 U.S. 632 (2016) .......................................................31

*Rucker v. Giffen*, 997 F.3d 88 (2d Cir. 2021) ........................................35-36

*Sandoval v. Cnty. of Sonoma*, 912 F.3d 509 (9th Cir. 2018) .................14

*Siggers v. Campbell*, 652 F.3d 681 (6th Cir. 2011) ...............................21

*Smith v. Andrews*, 75 F.4th 805 (8th Cir. 2023) ....................................37

*Taylor v. Swift*, 21 F. Supp. 3d 237 (E.D.N.Y. 2014)............................33

*Turley v. Rednour*, 729 F.3d 645 (7th Cir. 2013) ..................................21, 24

*Weiss v. Barribeau*, 853 F.3d 873 (7th Cir. 2017)..................................37

*Wilcox v. Brown*, 877 F.3d 161 (4th Cir. 2017)......................................21, 24

*Wilk v. Neven*, 956 F.3d 1143 (9th Cir. 2020) ........................................15-19

*Williams v. California*, No. 17-CV-02511-HSG, 2017 WL 5128007 ....
    (N.D. Cal. Nov. 6, 2017) ..............................................................38

*Woodford v. Ngo*, 548 U.S. 81 (2006). ...................................................20

## Statutes and Rules

28 U.S.C.
    § 1291 ..........................................................................................3
    § 1331 ..........................................................................................2
    § 1343 ..........................................................................................2
    § 1391 ..........................................................................................2

42 U.S.C. § 1997e...................................................................................20

Fed. R. App. P. 4...................................................................................3

**INTRODUCTION**

Shawn Sheltra was violently attacked in his cell by another prisoner while in the custody of the Idaho Department of Corrections ("IDOC"). The attack rendered Sheltra, who has only one eye, functionally blind: his eye was beaten so severely that it remained swollen shut for over a month. To this day, he continues to suffer from impaired vision, headaches, neck pain, and mental health disturbances.

This brutal assault need never have happened. For two months leading up to the attack, Sheltra repeatedly alerted the defendants to ongoing threats of extortion and physical assault by exhausting IDOC's three-step grievance procedure. First, he filed five concern forms, explaining the nature of the threats and naming the prisoners who were threatening to attack. But prison officials failed to protect him. Second, he filed a formal grievance reiterating these threats, suggesting a solution—transfer to another unit—and pleading with prison officials to take his safety seriously. Still, prison officials failed to protect him. Third, he appealed the denial of the grievance, further specifying the nature of the ultimatum he had received and the date after which an attack would occur. Even then, prison officials failed to protect him.

The district court rejected Sheltra's failure-to-protect claim on a single, erroneous basis: its conclusion that Sheltra's pre-attack grievances did not satisfy

the Prison Litigation Reform Act's ("PLRA") administrative exhaustion requirement. Relying on a few inapposite and unpublished district court decisions, it held that Sheltra was required to grieve again, *post*-attack.

Such a requirement conflicts with binding Eighth Amendment precedent. The Supreme Court and this Court have long made clear that a failure-to-protect claim arises when prison officials consciously expose a prisoner to a substantial risk of serious harm—not when that harm eventually manifests. Moreover, under the continuing violations doctrine, all seven circuits to reach the issue have concluded that when, as here, mistreatment of a prisoner is ongoing, he must exhaust only once before litigating the violation and its subsequent results. The district court simply failed to consider any of this caselaw. Additionally, the grievance process was unavailable to Sheltra post-attack; IDOC policy prohibits successive grievances on the same issue and his injuries were incapacitating. The district court's grant of summary judgment to the defendants should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Sheltra's civil rights action under 28 U.S.C. §§ 1331, 1343. Venue was proper in the District of Idaho because the constitutional violations occurred in that district and all the parties resided in that district. *See* 28 U.S.C. § 1391(b).

On May 5, 2021, the district court entered its final judgment. ER-26. Sheltra timely filed both a notice of appeal and a motion for reconsideration on May 12, 2021. ER-21, ER-163; Fed. R. App. P. 4(a)(1)(A). On May 17, 2021, the Court noted that the pending motion for reconsideration meant that Sheltra's notice of appeal was "ineffective until entry of the order disposing" his motion was entered. ER-19. On September 14, 2021, the district court denied Sheltra's motion for reconsideration. ER-2. Sheltra timely filed an amended notice of appeal on September 24, 2021. ER-160; Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

I.A.    Whether the district court erred in presuming Sheltra's Eighth Amendment failure-to-protect claim did not arise until the attack, overlooking binding precedent that establishes that a constitutional violation occurs when a prison official consciously exposes a prisoner to a substantial risk of harm—not when the resultant harm itself occurs.

I.B.    Whether the district court erred in concluding that Sheltra was required to submit a grievance after the attack to exhaust his Eighth Amendment failure-to-protect claim, overlooking unanimously adopted persuasive authority establishing that prisoners need not file repetitive grievances when they are subjected to a continuing violation.

II.     Whether the district court erred in determining that grievance procedures remained available to Sheltra after the attack, failing to properly consider IDOC's prohibition on repetitive grievances and the debilitating nature of his injuries.

## STATEMENT OF THE CASE

**I.     Prison officials placed Sheltra in unsafe living conditions. Following prison policy, Sheltra repeatedly communicated his concerns, documenting the ongoing threats to his safety on concern forms, a grievance, and an appeal. The defendants took no protective action.**

On February 14, 2020, prison officials placed Shawn Sheltra, an Idaho state prisoner, on the same walk—D-1—as a prisoner who had previously threatened him in 2018—Cody Willard. ER-50. That day, another prisoner, Bill Young, told Sheltra that he needed "to move up or [Young] will move down so [they] could fight"; this threat was repeated to Sheltra three days later. ER-47, ER-49. Fearing that an attack was imminent, Sheltra followed IDOC policy and verbally communicated his concerns to the named defendants. ER-64, ER-91. He also submitted five concern forms to Sergeant Taylor, Corporal Frahs, and Deputy Warden McKay (all but the last of whom remain defendants) between February 14 and February 20. ER-47-50.

Between February 25 and March 10, 2020, the defendants took no action to protect Sheltra. Consequently, Sheltra filed a formal grievance on March 10, clearly stating his safety concerns and suggesting that he be transferred to D-2 as a

solution. ER-118. This was denied on the grounds of lack of documented safety concerns. ER-116-117. Sheltra appealed the denial on March 31, and again warned that he was under imminent threat of attack. ER-115.

As Sheltra had forewarned, he was brutally attacked in his cell on April 17, 2020. ER-65, ER-133. On July 31, Sheltra submitted a concern form requesting permission to file a new grievance. ER-55. This was denied without explanation. *Id.*

A. **IDOC policy requires prisoners to follow a multi-step procedure to properly exhaust their administrative grievances.**

The Idaho Department of Corrections Grievance and Informal Resolution Process has several components. ER-91. First, a prisoner must attempt to resolve the issue via informal conversation with a facility staff member. *Id.* If this is unsuccessful, the prisoner may submit an Offender Concern Form. *Id.* A staff member must respond to a concern form within seven days. *Id.*

If the concern form does not yield a satisfactory response, the prisoner can submit a grievance form within thirty days of the relevant incident. ER-96, ER-98. Extensions can be given by the prison officials reviewing the forms. ER-96. A grievance must document informal efforts to address the complaint, raise only one specific issue, and suggest a solution. ER-97. After submission, a grievance may receive up to two levels of review from prison officials. ER-98-101.

A prisoner may appeal an unsatisfactory grievance resolution within fourteen days of the reviewing authority's decision. ER-103. The appellate authority must then review the grievance, the officers' responses, and any applicable rules and policies, and grant, modify, or deny the prisoner's request. ER-103-106.

After a prisoner has fully exhausted this process, he is barred from submitting another grievance that addresses the same issue. ER-92. IDOC policy refers to these as "Previously Grieved Issues" and explicitly identifies them as non-grievable. *Id.*

**B.  Sheltra verbally communicated his concerns to the defendants, and documented the ongoing threats to his safety on concern forms they reviewed. The defendants took no action to protect him.**

Immediately following his arrival on D-1 on February 14, Sheltra sent his first concern form ("Concern Form 1") to Deputy Warden McKay, indicating that he had been housed on the same unit as someone he had conflict with two years earlier. ER-50. He also stated that he had been assaulted the previous day, and that he worried he would be attacked again, as he was classified as medium security but had been placed with maximum security prisoners. *Id.*

The same day, Sheltra sent another concern form ("Concern Form 2") to the shift command indicating that he had been warned of an impending attack by prisoner Young. ER-47. He sent a third concern form ("Concern Form 3") to

Sergeant Taylor, reiterating that he had informed Taylor of his security concerns prior to being placed on D-1; Sheltra warned Taylor that if he was indeed attacked, it would be due to officials' failure to protect him. *Id.*

On February 17, Sheltra sent a concern form ("Concern Form 4") to Corporal Frahs, stating that someone had told Sheltra that Young and others were coming down, reiterating previously voiced threats that Young and others would soon attack him. ER-49.

On February 18, Sergeant Taylor responded to Concern Forms 2 and 3, telling Sheltra that he did not have any documented safety concerns—despite the fact that the very forms to which he was responding documented such concerns. ER-47. Sergeant Taylor told Sheltra to contact Investigations if he felt unsafe. *Id.*

Sheltra sent yet another concern form ("Concern Form 5") to Corporal Frahs on February 20, saying that Frahs was failing his duty as a correctional officer to keep Sheltra safe, that Sheltra had communicated that he was being extorted, and that the extortion needed to be reported. ER-49.

On February 21, Deputy Warden McKay finally responded to Concern Form 1, telling Sheltra to contact Security if he would like to be moved. ER-50. Corporal Frahs responded to Concern Forms 4 and 5 on February 25, telling Sheltra that he had passed his concerns onto Investigations. ER-49.

**C.** **Sheltra submitted a grievance form that documented informal resolution efforts, reiterated the ongoing threats to his safety, and requested a transfer. The defendants took no protective action in response.**

Between February 25 and March 10, the defendants took no action to address Sheltra's concerns. Because the problem was not resolved via in-person conversations and concern forms, he filed a formal grievance on March 10, 2020. ER-118. In the grievance, Sheltra stated, yet again, that he had "two safety concerns on D1." *Id*. He notified the defendants that he "already had to pay $30," that he "was threaten[ed] by two inmates that day," and that "[t]his is failure to protect and refus[a]l to protect." *Id*. In accordance with the IDOC mandate that prisoners suggest a solution, Sheltra requested to be transferred to D-2. *Id.*

On March 18, Sergeant Taylor returned the Level 1 response. ER-113. His response was yet again completely unresponsive. Although Sheltra's Concern Forms 4 and 5 had been forwarded to Investigations, Taylor stated that Sheltra "had over a year to inform the Investigations team of any safety concerns."[1] *Id.* He also stated that Sheltra "still [had] no active safety concerns with any inmates currently housed at ISCC" and that his "current behavior [was] not suitable" to be

---

[1] In late 2018, Sheltra had filed a concern form about an earlier threat of assault by one of the same prisoners. ER-48. This concern form was sent to Investigations, and apparently warranted placement in protective custody. ER-45, ER-48, ER-50. It is unclear why Sheltra's five concern forms in 2020 did not merit the same response, even though they mentioned the same would-be assailant. ER-47-50.

housed in D-2. *Id.* Despite rejecting transfer, Taylor offered no alternative
protective measures.

On March 25, Sergeant Dietz returned the Level 2 response. ER-114. He
affirmed the Level 1 response in full, denying transfer because of the lack of
"documented safety concerns on D1," "consistent behavioral issues," and Sheltra's
alleged attempt to "manipulate housing." *Id*. Like Sergeant Taylor, Sergeant Dietz
offered no protective resolution.

> **D.** **Sheltra appealed the denial of his grievance. The defendants then
> accused him of participating in an extortion ring and briefly placed
> him in isolation during the pendency of an investigation into their
> own accusations.**

On March 31, Sheltra timely appealed the defendants' Level 1 and 2
grievance responses. In his appeal, Sheltra named Walton, Young, and Willard as
the perpetrators of ongoing extortion efforts and, once again, offered clear notice
of imminent threats of bodily harm. ER-115. He reported that Willard, Young, and
Walton had demanded $100 from him by April 10 and that if he did not pay them,
he would be "attack[ed] or worse rape[d]." *Id*. He specifically wrote in his appeal
that if he failed to pay on April 10 and was attacked or sexually assaulted, it would
be due to the defendants "failing to act to protect" him. *Id*.

Instead of acknowledging his safety concerns, Warden Christensen
responded to Sheltra's appeal by accusing him of participating in an extortion ring
and notifying him that he would be isolated "for the course of that investigation."

9

ER-114. After approximately one week, the defendants placed Sheltra back in D-1—the housing unit where he had previously been threatened—without explanation. ER-65.

> **E.** **After Sheltra was released from isolation, the defendants left him in jeopardy. Just as Sheltra had foretold, he was attacked.**

On April 17, just as he had repeatedly warned via concern forms, formal grievance, and appeal, Sheltra was violently assaulted in his cell. ER-65, ER-133. The attacker received payment from a prisoner who had been identified in Sheltra's appeal. ER-135, ER-137. During the attack, Sheltra's sole eye was beaten so badly that it remained swollen shut—rendering him functionally blind—for over a month. ER-59, ER-65, ER-133. When swelling finally subsided over a month later, Sheltra discovered that he retained only partial vision in his "good" eye. ER-137. Because of the attack, Sheltra also suffers from headaches, severe neck pain "at all times," and disturbances to his mental health. *Id*.

Once Sheltra's eye was sufficiently healed, and despite fearing that he would be "beaten again as a 'Snitch'" for requesting protection, Sheltra submitted a concern form on July 27, 2020, requesting permission to submit an untimely grievance. ER-55. Without any explanation, the grievance coordinator responded by writing, "Dietz has denied this request." *Id*.

## II.    Procedural History

Sheltra filed a pro se complaint against the defendants in the District of

Idaho on April 30, 2020. ER-164. On June 19, 2020, the screening judge ordered

Sheltra to sever his claims and denied his request for appointment of counsel.

ER-158-159. In Sheltra's amended complaint filed on July 23, he sued Defendants

Christensen, Dietz, Taylor, and Frahs for violating his Eighth Amendment rights

by failing to protect him from harm from other prisoners. ER-131-138. The district

court found the allegations sufficient to proceed. ER-126.

The defendants moved for summary judgment on January 4, 2021. ER-67.

Instead of directly addressing the failure-to-protect claim raised in Sheltra's

amended complaint, the defendants incorrectly characterized the April 17, 2020,

attack as the source of the constitutional violation. ER-71. In his opposition to the

motion for summary judgment, Sheltra explained that the April 17 attack did *not*

form the basis of his claim; rather, he reiterated that the defendants had violated his

rights by failing to protect him from diligently grieved threats prior to the attack.

ER-58.

The district court adopted the defendants' framing of the issue—relying

almost exclusively on one unpublished district court case—and granted the

defendants' motion for summary judgment. ER-32-35. It dismissed Sheltra's

complaint without prejudice on the sole basis that he had failed to exhaust. ER-34.

Sheltra filed a motion for reconsideration on May 12, again emphasizing that the defendants and the district court had misconstrued his complaint. ER-22. On the same day, Sheltra filed a Notice of Appeal. ER-163. Appellate proceedings were stayed pending adjudication of his motion for reconsideration. ER-19.

The district court denied Sheltra's motion for reconsideration. ER-8. Sheltra then filed an opening brief in this Court on November 8, 2021. 9th Cir. Dkt. 8. After briefing was completed, on March 13, 2023, the Court ordered appointment of pro bono counsel. 9th Cir. Dkt. 28. Undersigned counsel was appointed on August 1, 2023. 9th Cir. Dkt. 29.

## SUMMARY OF THE ARGUMENT

I.A.    Sheltra's Eighth Amendment failure-to-protect claim arose prior to the April 17 attack. Binding precedent establishes that a constitutional violation occurs when a prison official consciously exposes a prisoner to a substantial risk of serious harm. The exposure to the risk of violence—rather than the completed attack itself—forms the basis of the claim. Therefore, the defendants' knowing failure to take action to protect Sheltra constituted an ongoing violation of the Eighth Amendment. This violation was actionable as soon as Sheltra exhausted the grievance process.

I.B.    Sheltra's pre-attack exhaustion was sufficient. All seven circuits to reach the issue have adopted the continuing violations doctrine, which instructs

that when a prisoner is subjected to an ongoing violation, filing repeat grievances after each successive resultant harm is unnecessary to satisfy the PLRA's requirement. This Court should join the unanimous consensus. Applied to Sheltra's case, the continuing violations doctrine makes clear that he properly exhausted. From concern form through timely appeal, Sheltra consistently protested the defendants' failure to protect him from threats of extortion and physical attack. Because the harm that he suffered during the April 17 attack resulted from the defendants' continuous violation, Sheltra's pre-attack grievances were enough.

II.     In the alternative, Sheltra should be excused from any obligation to exhaust following the attack because the IDOC grievance process was then unavailable to him. This is so for two reasons. First, IDOC policy specifically prohibits prisoners from submitting successive grievances addressing issues that have previously been fully grieved. Because Sheltra exhausted all administrative review regarding the defendants' failure to protect him from harm before the attack, he was precluded from submitting another grievance requesting protection after the attack. Second, Sheltra's one remaining eye was swollen shut for over a month following the attack. This blindness, on its own and along with other physical and mental health repercussions, left him unable to file a timely grievance. Once he did attempt to file an untimely grievance, the defendants refused to accommodate his previous incapacity.

## STANDARD OF REVIEW

Because summary judgment is a question of law, this Court reviews a district court's order granting or denying summary judgment de novo. *Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018). On review, appellate courts "determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 832 (9th Cir. 2002). A district court's interpretation of a federal statute—such as its application of the Prison Litigation Reform Act's administrative exhaustion requirement—is a question of law also subject to de novo review. *BNSF Ry. Co. v. Or. Dep't of Revenue*, 965 F.3d 681, 685 (9th Cir. 2020); *Fordley v. Lazarraga*, 18 F.4th 344, 350 (9th Cir. 2021).

## ARGUMENT

I. **Sheltra properly exhausted his failure-to-protect claim prior to the April 17 attack.**

The defendants violated Sheltra's Eighth Amendment right to be protected from harm at the hands of fellow prisoners when they failed to take action to protect him from the threats of financial extortion and physical assault about which he alerted them. Because Supreme Court and Ninth Circuit precedent does not require a threatened harm to befall a prisoner as a predicate to establishing that a constitutional violation has occurred, Sheltra properly exhausted administrative

14

remedies through his pre-attack concern forms, March 10 grievance, and March 31 appeal. Moreover, the continuing violations doctrine—unanimously adopted by the seven circuits to have considered it—instructs that when mistreatment of a prisoner is ongoing, he need exhaust only once. Because the April 17 attack was an instance of the defendants' continual failure to protect Sheltra from ongoing threats of extortion and assault, he was not required to file a post-attack grievance to satisfy the exhaustion requirement.

## A.    Sheltra's failure-to-protect claim arose prior to the attack.

The district court's exhaustion analysis—its sole basis for granting summary judgment for the defendants—presumed that Sheltra's claim arose when he was attacked on April 17. ER-6-7, ER-31-34. In fact, his claim arose well before then, when the defendants left him in conditions that he warned posed a substantial risk of serious harm to his safety.

### 1.    The Supreme Court held in *Farmer* that an Eighth Amendment failure-to-protect claim arises when a prison official exposes a prisoner to a substantial risk of serious harm, even if the harm has not yet materialized.

The Eighth Amendment requires prison officials to protect prisoners from known threats of violence. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020). Liability attaches once an official is aware that a prisoner faces an objectively substantial "risk" of serious harm and

subjectively disregards that risk by failing to respond appropriately. *See Farmer*, 511 U.S. at 834, 837, 844-45, 847; *Wilk*, 956 F.3d at 1147.

In *Farmer*, the Court explained that a prisoner must show only that he is being held under conditions posing a substantial risk of serious harm—and need not show that the harm itself has materialized—to substantiate an Eighth Amendment failure-to-protect claim. 511 U.S. at 834. The *Farmer* Court specifically held that a prisoner who is exposed to a substantial risk of serious harm should not be denied relief because no harm has yet befallen him. *Id.* at 845 (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). In other words, a prisoner is not required to wait for the "tragic event" to occur before seeking relief.[2] *Id.* (quoting *Helling*, 509 U.S. at 33-34).

> ## 2. The Ninth Circuit has repeatedly and recently applied this well-settled doctrine.

The Ninth Circuit has consistently recognized that an Eighth Amendment violation arises in a failure-to-protect case when a prisoner is incarcerated under conditions that officials know expose him to a substantial risk of serious harm. The harm that follows is simply evidence of the objectively substantial risk and of the

---

[2] When the threatened event has not happened yet, a prisoner-plaintiff will be eligible for injunctive relief but unlikely to receive compensatory damages. *See Farmer*, 511 U.S. at 845 (citing *Pennsylvania v. West Virginia,* 262 U.S. 553, 593 (1923)).

magnitude of damages. Take *Lemire v. California Department of Corrections & Rehabilitation*, 726 F.3d 1062 (9th Cir. 2013), for example. In *Lemire*, two prison officials removed all floor officers from a prison building that housed mentally ill prisoners for three-and-a-half hours. *Id.* at 1068. Once the officers returned to the unit, they found the plaintiff's son unconscious, and he later died. *Id.* at 1072-73. This Court held that leaving the prisoners without supervision, without security checks, and without any prison official able to respond to emergency calls for that length of time created an objectively substantial risk of serious harm to the prisoners in the building, especially since the floor officers' main job was to check on prisoners' welfare and prevent suicides and violence. *Id.* at 1070, 1072, 1076. In its analysis, this Court repeatedly framed the violation as "expos[ure] to risk." *See id.* at 1068, 1075-77.

The Ninth Circuit employed the same analysis in *Wilk v. Neven*, 956 F.3d 1143 (9th Cir. 2020). The plaintiff in *Wilk* had been threatened by another prisoner in his unit. *Id.* at 1146. The plaintiff reported the threat and was moved into administrative segregation for protection, but he was returned to the same unit ten days later, even though the person who threatened him remained there. *Id.* More than three months later, the plaintiff was attacked. *Id.* This Court found that a reasonable jury could find that the defendants were aware of a substantial risk of serious harm the day that the plaintiff was returned to his original unit—*not* the

day he was attacked over three months later. *Id.* at 1149. As a result, it held that the plaintiff's evidence supported a finding of liability. *Id.* at 1150.

The Ninth Circuit also applied *Farmer*'s core holding in *Cortez v. Skol*, another failure-to-protect case in which this Court reversed the district court's grant of summary judgment. 776 F.3d 1046, 1050, 1055 (9th Cir. 2015). In *Cortez*, the defendant led three "mutually hostile, half-restrained, high-security prisoners" by himself through an isolated prison alleyway. *Id.* at 1048. As soon as the defendant reached for his keys, two of the prisoners violently attacked the third—the plaintiff—causing him to suffer brain damage. *Id.* at 1049. This Court found that the objective component of the *Farmer* standard was satisfied when the defendant exposed the plaintiff to substantial risk of serious harm by being "outnumbered, out of view, and away from backup" when transporting the three prisoners. *Id.* at 1052. This Court did not describe the attack itself as an element of the claim; instead, it observed that the defendant officer had violated the plaintiff's rights by creating conditions where he would be "uncomfortable intervening" if and when an attack occurred. *Id.*

In each of these failure-to-protect cases, the Ninth Circuit recognized that the plaintiffs' claims arose before they suffered any physical harm; rather, their Eighth Amendment rights were violated once the defendants consciously exposed them to a substantial risk of serious harm. *See also Baker v. Howard,* No.

219CV2617KJMDMCP, 2021 WL 2142734, at *10 (E.D. Cal. May 26, 2021)

("An Eighth Amendment failure to protect claim involves risk to an inmate, *not necessarily* completed harm."), *report and recommendation adopted*, 2021 WL 2894118 (E.D. Cal. July 9, 2021).

### 3. Applying this binding precedent, the defendants violated Sheltra's Eighth Amendment rights prior to the attack.

According to binding precedent, Sheltra's Eighth Amendment failure-to-protect claim arose once the defendants were on notice that he was exposed to a substantial risk of serious harm but failed to take any action to protect him. From February 14 onwards, Sheltra received, and relayed to defendants, multiple threats that if he did not pay particular prisoners a set amount by a fixed date, he would be attacked. ER-45-53. Although he made defendants aware of these threats, they took no steps to protect him. Each day that the defendants kept him housed with those they knew had threatened to attack him, they exposed him to a substantial risk of serious harm, creating an ongoing violation of his Eighth Amendment rights. *See Wilk*, 956 F.3d at 1149.

By incorrectly reasoning that Sheltra could not have grieved an event that had not already happened, the district court misunderstood the legal significance of the April 17 attack. ER-31-33. Rather than precipitating Sheltra's claim, the attack was powerful evidence confirming the substantial risk of serious harm to which Sheltra had been exposed for approximately two months. *See Cortez*, 776 F.3d at

1052. The serious injuries he suffered will likewise be relevant to the compensatory damages he is due. But the elements of Sheltra's claim took place, and liability arose, prior to the attack.

## B. Under the continuing violations doctrine, Sheltra was not required to exhaust again after the risk of harm to which the defendants exposed him finally materialized.

The PLRA mandates that "[n]o action shall be brought with respect to prison conditions . . . until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). The purpose of this requirement, according to the Supreme Court, is to "afford[] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 525 (2002). This Court has independently echoed this understanding. *See, e.g.*, *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) ("The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution."). To comply with the letter and purpose of the exhaustion requirement, prisoners must "properly" adhere to "all steps that the [prison] holds out." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

Throughout this litigation, the defendants have never contested that Sheltra's pre-attack grievance and appeal adhered to IDOC's three-step procedure. Based on the district court's decision below, the only question for this Court is whether Sheltra was required to restart the grievance process *after* the attack to exhaust his

failure-to-protect claim. Unanimous persuasive authority holds that such a repetitive grievance was unnecessary.

> 1. **A unanimous consensus of seven circuits has adopted the continuing violations doctrine, which holds that prisoners need not file successive grievances raising the same issue if the constitutional deprivation is continuing.**

As applied to the exhaustion requirement,[3] the continuing violations doctrine instructs that where there is "'one, continuing harm' or a single course of conduct (which can lead to discrete incidents of harm), filing repeat grievances is unnecessary." *Morgan v. Trierweiler*, 67 F.4th 362, 369-70 (6th Cir. 2023) (quoting *Siggers v. Campbell*, 652 F.3d 681, 692-93 (6th Cir. 2011)). To date, seven of this Court's sister circuits have adopted this doctrine in the context of the PLRA's administrative exhaustion requirement. *See Johnson v. Johnson*, 385 F.3d 503, 521 (5th Cir. 2004); *Howard v. Waide*, 534 F.3d 1227, 1244 (10th Cir. 2008); *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1219 (11th Cir. 2010); *Johnson v. Killian*, 680 F.3d 234, 238-39 (2d Cir. 2012); *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013); *Wilcox v. Brown*, 877 F.3d 161, 167 n.4 (4th Cir. 2017); *Morgan*, 67 F.4th at 369-71. Not a single judge has dissented in any of

---

[3] The continuing violations doctrine was first employed in the statute of limitations context. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982).

these cases. The remaining circuits, including the Ninth, have yet to reach the issue.[4]

The Fifth Circuit was the first to apply the continuing violations doctrine to the PLRA exhaustion requirement, beginning the subsequent cascade of agreement. *See Johnson*, 385 F.3d at 521. In *Johnson*, the defendants argued that because the plaintiff had filed only one grievance in March 2001 concerning "near-constant sexual assault," he had failed to exhaust any claims related to conduct that occurred after that submission. *Id.* at 519. The court disagreed, holding that the plaintiff's grievance was "sufficient to exhaust claims that arose from the same continuing failure to protect him from sexual assault." *Id.* at 521. Especially because internal policies explicitly proscribed repetitive grievances, "it would [have made] little sense" to require the plaintiff "to file repeated grievances reminding the prison officials that he remained subject to attack in the general population." *Id.*

---

[4] *See Hunter v. Rohrer*, No. 3:18-CV-05198-BHS-JRC, 2021 WL 4067463, at *10 (W.D. Wash. Apr. 21, 2021) (observing that the Ninth Circuit has not explicitly held that the continuing violations doctrine applies to PLRA exhaustion); *Alexis v. Connors*, No. 18-2099, 2023 WL 4525959, at *7 (D.N.J. July 13, 2023) (noting that the Third Circuit has yet to apply the continuing violations doctrine in the PLRA exhaustion context). A diligent search of the remaining circuits uncovered no cases in which appellate or district courts applied, or declined to apply, the continuing violations doctrine.

Faced with a similar failure-to-protect claim, the Tenth Circuit adopted *Johnson*'s reasoning without hesitation. *See Howard*, 534 F.3d at 1244. In *Howard*, the plaintiff was sexually assaulted two times *after* properly filing an April 2005 grievance alerting officials that he had received repeated threats of economic extortion and physical assault from prison gang members. *Id.* at 1230, 1232-33. On appeal, the defendants argued that the plaintiff's failure-to-protect claims were unexhausted because he did not grieve the August 2005 sexual assaults and other subsequent threats that were "the centerpiece" of his litigation efforts. *Id*. at 1244. Ultimately, the Tenth Circuit held that the plaintiff "was not required to begin the grievance process anew when the very risk to his safety that he identified during the grievance process came to pass in August 2005." *Id.* at 1244. As in *Johnson*, the court reasoned that such a requirement would be "redundant." *Id.*

Since *Howard*, five more circuits have adopted the continuing violation doctrine, confirming its seamless applicability to all types of constitutional violations. Almost invariably, too, these courts have underscored the doctrine's alignment with the PLRA's stated purpose; that is, so long as the prisoner gives officials notice of, and an opportunity to correct, a particular ongoing violation, filing repetitive grievances about the same issue is unnecessary. For example, the Second Circuit concluded that a plaintiff's 2005 grievance regarding limitations on

congregational prayer was sufficient to exhaust because it "provided the prison administration with notice of, and an opportunity to resolve, the same problem that would continue intermittently through 2007." *Killian*, 680 F.3d at 238. The Seventh Circuit has likewise held that, because a plaintiff's initial grievance gave "the prison a chance to correct" its continually implemented illegal lockdown policies, he did not need to file successive grievances when lockdowns continued to occur. *Turley*, 729 F.3d 645 at 650.

The Eleventh and Fourth Circuits have employed practically identical reasoning. *See Parzyck*, 627 F.3d at 1219; *Wilcox*, 877 F.3d at 167 n.4. In *Parzyck*, the Eleventh Circuit held that a plaintiff's grievance requesting orthopedic consultation "accomplished §1997e(a)'s purpose by alerting prison officials to the problem and giving them the opportunity to resolve it before being sued." *Parzyck*, 627 F.3d at 1219. As such, he was not required to file a new grievance each time another request for consultation was denied. *Id*. And in *Wilcox*, the Fourth Circuit held that a plaintiff's grievance concerning ongoing discontinuation of Rastafarian services served "the purpose of the exhaustion requirement" and therefore obviated any need for repetitive grievances in response to similar First Amendment deprivations. *Wilcox*, 877 F.3d at 167 n.4.

Finally, earlier this year, the Sixth Circuit became the seventh court to adopt the continuing violations doctrine. *See Morgan*, 67 F.4th at 371. In *Morgan*, the

plaintiff, a devout Muslim, properly filed a grievance alerting the defendants that he was continuously being denied access to a Halal diet. *Id.* at 370. Because the "'same condition of confinement' led to an ongoing harm," the court held that the plaintiff's initial grievance was sufficient to exhaust for identical First Amendment deprivations postdating that submission. *Id.* at 371 (quoting *Johnson*, 385 F.3d at 520). Echoing the unanimous holdings outlined above, the court observed that "[i]f one grievance is not enough, it is difficult to see how often grievances would need to be filed for this type of violation." *Id.* at 370.

> **2.  Multiple district courts in the Ninth Circuit have applied the continuing violations doctrine to disputes regarding the PLRA's administrative exhaustion requirement.**

Though the Ninth Circuit has yet to apply the continuing violations doctrine to the PLRA exhaustion requirement, multiple district courts in the Ninth Circuit have done so. *See, e.g.*, *Bryant v. Fed. Bureau of Prisons*, No. 2:11-CV-00254-CAS, 2014 WL 2472255, at *6 (C.D. Cal. June 2, 2014) (holding that, because the plaintiff's grievance complained of continuing violations of the Rehabilitation Act, he did not need to individually grieve each allegation that pertained to the "same overarching issues"). In so doing, these courts have unreservedly relied on the above-mentioned circuit majority to guide their analysis.

In *Becker v. Sherman*, for example, the court employed the "highly-persuasive" continuing violations doctrine to hold that, because the defendants

were "on notice of Plaintiff's allegation of a continuing failure to protect her from sexual assault," she did not need to file additional grievances. No. 1:16-CV-828 AWI JDP, 2018 WL 4616281, at *6-7 (E.D. Cal. Sept. 25, 2018). And in *Reed v. Washington State Department of Corrections*, the court applied "well-developed persuasive authority" to conclude that the plaintiff's grievance regarding continually inadequate medical care obviated the need to file separate grievances for closely related treatment failures. No. 3:16-CV-05993-BHS-DWC, 2021 WL 8086628, at *12-13 (W.D. Wash. Apr. 16, 2021), *report and recommendation adopted in relevant part*, 2022 WL 970148, at *2 (W.D. Wash. Mar. 31, 2022); s*ee also Hunter v. Rohrer*, No. 3:18-CV-05198 BHS JRC, 2021 WL 4067463, at *10 (W.D. Wash. Apr. 21, 2021).

The weight of this authority is overwhelming. Presented with the unanimous position of the seven circuits to reach the issue, district courts in the Ninth Circuit have conformed without objection. Accordingly, this Court should formally adopt the continuing violations doctrine in the PLRA exhaustion context.

> ### 3. Sheltra properly exhausted administrative remedies as to the defendant's ongoing failure to protect him.

In holding that Sheltra failed to exhaust his administrative remedies before filing this action, the district court entirely overlooked the continuing violations doctrine. ER-33. A straightforward application of the doctrine, however, demonstrates that Sheltra's submissions clearly reflected a continuing violation. At

each step of IDOC's three-step procedure, Sheltra consistently grieved the defendants' ongoing failure to protect him from the same threats of economic extortion and physical attack.

Despite submitting *five* concern forms documenting continual threats of extortion and impending physical harm, the defendants took no protective action. In three February 14 concern forms, Sheltra stated that he was housed with a prisoner that had caused him issues in 2018, that "Mr. Young" came to his cell and threatened to fight him, and that the defendants' failure to address his "saf[e]ty concerns" was "failure to protect." ER-47. Three days later, Sheltra submitted another concern form, yet again notifying the defendants that Young was threatening him. ER-49 ("'Someone came down and stated '[Young] and them are coming down'"). In his final concern form, submitted on February 20, Sheltra protested that, although he had informed Corporal Frahs he was being extorted, Frahs "continued to ignore a cry for help" and had "failed [his] duty as a correctional officer." *Id.* The defendants took no action in response to these concern forms. In fact, in his reply to Sheltra's third concern form—which specifically requested that his ongoing safety concerns be recognized—Sergeant Taylor stated that Sheltra did not "have any documented safety concerns on D-1." ER-47.

Sheltra's March 10 grievance further solidified the continuing nature of the defendants' failures. In this submission, he stated that "he had two safety concerns on D1," was extorted to "pay $30," and that "[t]his is failure to protect and refuses [sic] to protect." ER-118. To escape these threats, Sheltra requested transfer to D-2. *Id.* This request was summarily denied by the Level 1 and Level 2 responders—Sergeants Taylor and Dietz respectively—both of whom *again* stated that Sheltra had no documented safety concerns. ER-116-117. In his timely March 31 appeal, Sheltra made one last plea for protection: he stated that, if he did not pay "Walton, Young, and now Willard" $100 by April 10, "they're going to attack or worse rape me." ER-115. He also stated that he'd given the defendants "notice of the situation . . . and [they were] purposely failing to act to protect [him]." *Id.* In response, Warden Christensen accused *Sheltra* of launching the extortion ring and, to facilitate an investigation of this allegation, placed him in isolation. ER-114. After a short period, Sheltra was placed back in a D-1 cell "with the person who was extorting him." ER-58, ER-65.

On April 17, Sheltra was brutally attacked by an assailant paid by a prisoner that had previously threatened him and whom he had previously identified. ER-65, ER-133. Put another way, the ongoing risk to Sheltra's safety that he *repeatedly* identified in the grievance process finally came to pass. This is a textbook example of a continuing violation. Submitted over a month-and-a-half period, Sheltra's pre-

attack grievance materials consistently concerned a single, continuing violation—the defendants' failure to protect him from incessant threats of extortion and assault. There is no doubt that the defendants had adequate notice of, and opportunity to resolve, the threats to Sheltra's safety. The district court's determination that Sheltra failed to exhaust should be reversed.

## C. The district court's cited authority is misplaced.

Compounding its failure to apply the continuing violations doctrine, the district court's exhaustion holding relied entirely on sparse and misplaced authority imported directly from the defendants' summary judgment briefing. It cited three unpublished district court orders, each of which made no reference to the body of caselaw just discussed, and none of which supported the conclusion that Sheltra was required to file a post-attack grievance to exhaust his failure-to-protect claim.

The district court relied most heavily on *Perry v. Dickinson*. No. 2:10-cv-3223 KJN P, 2012 WL 2559426 (E.D. Cal. June 29, 2012). But, contrary to its assertion, Sheltra's case is *not* "highly analogous to the situation in *Perry*." ER-33. In that case, the plaintiff submitted four grievances; one prior to an attack and three afterwards. *Perry*, 2012 WL 2559426, at *2-5. Though the magistrate's order dismissed the plaintiff's failure-to-protect claim on exhaustion grounds, it did so not because any of his grievances predated the attack. Rather, the plaintiff's claim was unexhausted because none of his four grievances notified the defendants of any risk of imminent

violence. *Id*. at *3-5. Unlike Sheltra—who consistently notified the defendants of specific, continuing threats of attack and extortion—the *Perry* plaintiff's grievances protested segregated housing, cell temperature, understaffing, and placement in administrative segregation. *Id*. Conspicuously, the district court's coverage of *Perry* included none of this information. Instead, it zeroed in on the magistrate's assertion that "[d]efendants' objection as to timing is well-taken." ER-32-33 (quoting *Perry*, 2012 WL 2559426, at *3). In context, though, this remark concerned a hypothetical grievance that was *never actually filed* by the plaintiff. *Id.* Moreover, in the view of every one of the twenty-one federal appellate judges to have considered the continuing violations doctrine, this dictum is simply wrong.

The other two cases upon which the district court relied—*Dalton v. Aulepp*, No. 13-3089-SAC, 2015 WL 728490 (D. Kan. Feb. 19, 2015), and *Pasion v. McGrew*, No. 10-00443 HG-LEK, 2010 WL 3184518 (D. Haw. Aug. 11, 2010)— are even more incongruous. ER-32. In *Dalton*, the Kansas district court found that the plaintiff did not exhaust his administrative remedies for his denial-of-medical-care claim because his only grievance was submitted while he was at a *previous* facility under the care of *different* doctors; he had not yet met the defendant nor suffered the mistreatment at her hands that formed the basis of his complaint. *Dalton*, 2015 WL 728490, at *8. Sheltra, by contrast, filed his grievance at the same facility where he was attacked and directed it to the same named defendants against whom

he brought the lawsuit. In fact, a thorough reading of *Dalton* actually supports Sheltra's position. The *Dalton* court noted that, had the plaintiff filed his grievance while he was at the facility where the claim arose—as Sheltra did—prison officials would have had proper notice and his claims would have been exhausted. *Id.* Finally, in *Pasion*, the district court denied a habeas petition for lack of standing. 2010 WL 3184518, at *2. Because the case involved no Eighth Amendment claims, and because the PLRA's exhaustion requirement does not apply to habeas petitions, it has no relevance to this litigation. *See Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 634 (2d Cir. 2001) (citing cases). Even if an analogy were to be drawn between the timeliness of exhaustion for purposes of habeas and of the PLRA, *Pasion* would be inapposite, involving as it did a claim that was "completely speculative." 2010 WL 3184518, at *2.

## II. Alternatively, to the extent that post-attack exhaustion was necessary, the grievance process was unavailable to Sheltra in light of prison rules prohibiting successive grievances on the same issue and his incapacitating injuries.

Under the PLRA, prisoners must exhaust only those administrative remedies that are "available." *Ross v. Blake*, 578 U.S. 632, 636, 642-44 (2016) (identifying a "non-exhaustive" list of ways a prison grievance process can be unavailable). Because Sheltra properly exhausted prior to the attack, the Court need not consider whether his failure to do so afterwards should be excused. Were the Court to do so, however, it should conclude that the IDOC grievance procedure was "effectively

unavailable" to him following the attack for two reasons. *Nunez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010); *Andres v. Marshall*, 867 F.3d 1076, 1078 (9th Cir. 2017). First, prison rules prohibited consideration of successive grievances on the same topic—such as another grievance complaining of the defendants' ongoing failure to protect Sheltra from attack at the hands of an extortion ring. ER-92. Second, his injuries incapacitated him; his one remaining eye was beaten so badly that it swelled shut and he was unable to see. ER-59, ER-65. He was denied permission to file a late grievance once his vision improved. ER-55.

### A.    IDOC rules prohibit successive grievances on the same issue.

Where a prisoner is told that he may not grieve or appeal an issue, whether by broadly applicable policy or individual dictate, administrative remedies are unavailable, and the prisoner is excused from having to further exhaust.

The Ninth Circuit has applied this rule in cases where individual prisoners were informed that no further consideration of their grievances would be forthcoming. In *Brown v. Valoff*, a prisoner received a memorandum indicating that his appeal had been processed; its "reasonable import" was that no further review was available. 422 F.3d 926, 937-39 (9th Cir. 2005). Although the defendant argued that a further appeal "might have netted additional relief," the Court found that hypothetical relief in "contradict[ion] [of prison] directives" was not "available." *Id*. In *Marella v. Terhune*, a prisoner filed a grievance and received

a reply stating "[t]his . . . action may not be appealed." 568 F.3d 1024, 1027 (9th Cir. 2009) (per curiam). Though the district court had dismissed his action for failure to exhaust administrative remedies beyond the second level of appeals, the Ninth Circuit reversed, holding that the prisoner was excused from further exhaustion because he had been "reliably informed by an administrator that no remedies [were] available." *Id*.

The same logic has been applied by courts across the country in cases where prison policy renders certain entire categories of issues non-grievable. Consider, for example, *Owens v. Keeling*, a case involving a prison policy that prohibited the filing of grievances related to institutional placement. 461 F.3d 763, 769 (6th Cir. 2006). The Sixth Circuit held "[t]he non-grievability of [the prisoner's] . . . complaint through the grievance process makes that remedy unavailable under the PLRA, and thus he does not have to pursue that remedy to exhaust his claim." *Id*. In *Taylor v. Swift*, jail policy listed issues involving physical or sexual assault as non-grievable; the court held that exclusion of this category meant prisoners could refrain from exhausting those issues and go directly to court. 21 F. Supp. 3d 237, 241 (E.D.N.Y. 2014). In *Maney v. Brown*, prison officials categorically rejected grievances about social distancing, isolation, and quarantine; the court held that this rendered administrative remedies unavailable to prisoners challenging COVID-19 management. 464 F. Supp. 3d 1191, 1207 (D. Or. 2020).

IDOC policy states that "[a]fter an issue has been reviewed at the appellate level and all administrative review process remedies exhausted, a new Offender Concern Form . . . or Grievance/Appeal Form . . . that addresses the same issue will be rejected. This includes any issue that is written so that it appears to be a new issue." ER-92. Sheltra's pre-attack concern forms, grievance, and appeal all concerned the defendants' failure to protect him from particularized, unrelenting threats of extortion and assault. This issue was reviewed at the appellate level on April 2, two weeks before the attack. At that point, according to IDOC policy, Sheltra's safety concerns became non-grievable. A new round of grievances filed after the attack and challenging the defendants' failure to protect him, even if written to present the attack as a new issue, would have raised the same issue and therefore been rejected.[5] Because Sheltra was barred by IDOC policy from seeking further administrative relief as to the threats to his safety, the grievance process was unavailable to him.[6]

---

[5] By contrast, consider a grievance Sheltra might have filed complaining of inadequate medical care for his eye injury following the attack. That would have constituted a new issue and would have been grievable under IDOC policy. Sheltra would have been obliged to exhaust this new issue prior to filing a lawsuit regarding medical deliberate indifference.

[6] The district court rejected this argument in a brief paragraph and without citation. In light of its mistaken belief that the attack, rather than the defendants' failure to take protective action, gave rise to Sheltra's claim, it erroneously concluded that a

**B.** **Sheltra was unable to file a timely grievance because he was blinded, and the defendants refused to accommodate his request to file a late grievance.**

Many courts have taken limitations related to personal characteristics of the grievant, such as disability or medical condition, into account in assessing unavailability. This Court itself has articulated the general principle that some aspect of a prisoner's "particular case" may make "existing and generally available administrative remedies effectively unavailable to [him]." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc). And the Second, Fifth, Sixth, Seventh, and Eighth Circuits, along with a number of district courts within the Ninth Circuit, have recognized unavailability in the context of medically impaired or injured prisoners like Sheltra.

In *Rucker v. Giffen*, an injured prisoner spent over a month in the hospital and did not file a grievance until almost a year later—well past the five-day filing period. 997 F.3d 88, 93-94 (2d Cir. 2021). Nonetheless, the Second Circuit reversed the district court's grant of a motion to dismiss, recognizing that "a prisoner who is injured . . . faces a substantial obstacle to making use of administrative remedies," and that the prisoner's "medical condition precluded

---

post-attack grievance regarding "the attack itself" would have raised a different issue than the pre-attack grievances he filed regarding "the threat" he faced. ER-33.

timely filing of [a] grievance." *Id*. Because prison officials indicated that an untimely filing would not have been processed, the "administrative remedies bec[a]me effectively unavailable." *Id*. at 93. Ultimately, the Second Circuit held that a remedy was unavailable "when an inmate's failure to file for the administrative remedy within the time allowed result[ed] from a medical condition, and the administrative system [did] not accommodate the condition by allowing a reasonable opportunity to file for administrative relief." *Id.* at 94.

In *Days v. Johnson*, a prisoner fell and sustained multiple fractures of his writing hand; he argued that he was unable to submit a grievance until his hand healed, at which point the deadline had passed. 322 F.3d 863, 864-65 (5th Cir. 2003), *overruled on other grounds by Jones v. Bock*, 549 U.S. 199 (2007). The Fifth Circuit agreed with him that "because of his injury, exhaustion of his administrative remedies by timely filing a grievance was personally unobtainable." *Id*. at 867. Like the Second Circuit, the Fifth Circuit held that "administrative remedies are deemed unavailable when (1) an inmate's untimely filing of a grievance is because of a physical injury, and (2) the grievance system rejects the inmate's subsequent attempt to exhaust his remedies based on the untimely filing of the grievance." *Id*. at 868.

Other circuits have held similarly. In *Braswell v. Corrections Corporation of America*, the Sixth Circuit rejected an exhaustion defense based on its "substantial

doubt as to whether [the plaintiff] was mentally capable of filing a grievance." 419

F. App'x 622, 625 (6th Cir. 2011). In several cases, the Seventh Circuit has held

that physical or mental incapacitation can render a grievance process unavailable.

*See Hurst v. Hantke*, 634 F.3d 409, 412 (7th Cir. 2011) (stroke); *Weiss v.*

*Barribeau*, 853 F.3d 873, 874-75 (7th Cir. 2017) (serious mental illness);

*Lanaghan v. Koch*, 902 F.3d 683, 688-89 (7th Cir. 2018) (inability to use hands to

fill out form); *see also Kincaid v. Sangamon Cnty.*, 435 F. App'x 533, 537 (7th Cir.

2011) (medical emergency involving severe stomach pain, frequent vomiting, and

high fever). And in *Smith v. Andrews*, the Eighth Circuit reversed a grant of

summary judgment and remanded the claims of a prisoner who, while suffering

brain trauma after an assault, filed an untimely grievance alleging that prison

officials had failed to protect him. 75 F.4th 805, 807 (8th Cir. 2023). On remand, it

instructed the district court to determine whether administrative remedies were

unavailable "when (1) the inmate was unable to file a timely grievance due to . . .

incapacity; and (2) the administrative system's rules [did] not accommodate the

condition by allowing a late filing." *Id*. at 809.

Though the Ninth Circuit has not yet addressed whether a prisoner's medical

condition can render an administrative remedy effectively unavailable, several

courts within the circuit have adopted the reasoning of the aforementioned circuits.

In *Ollison v. Vargo*, for example, a prisoner was mentally and physically incapable

of filing a grievance during the prescribed period, and the grievance system did not allow late grievances. No. 6:11-CV-01193-SI, 2012 WL 5387354, at *2-3 (D. Or. Nov. 1, 2012). The court adopted "the Fifth Circuit's holding in *Days* that 'administrative remedies are deemed unavailable when (1) an inmate's untimely filing of a grievance is because of a physical injury, and (2) the grievance system rejects the inmate's subsequent attempt to exhaust his remedies based on the untimely filing of the grievance." *Id*. at *2. In *Cox v. Peters*, a prisoner's injuries left him "effectively blind." No. 2:19-CV-00376-AC, 2021 WL 2272926, at *2-3 (D. Or. May 14, 2021), *report and recommendation adopted*, 2021 WL 2269462 (D. Or. June 3, 2021). The court excused him from having to timely exhaust because he was personally unable to complete the grievance form. *Id*. at *8.[7]

Sheltra's injuries prevented him from filing a timely grievance, and IDOC refused to accommodate his incapacity when Dietz denied his request to file a grievance on July 27. ER-55. IDOC policy dictates that "[g]rievances must be submitted within 30 days of the incident," but extensions can be given by the prison officials reviewing the forms. ER-96. Sheltra has only one eye, and

---

[7] For other district courts within the Ninth Circuit reaching the same conclusion, *see also Carter v. Paramo*, No. 3:17-CV-1833-JAH-AGS, 2018 WL 4579854, at *5-6 (S.D. Cal. Sept. 25, 2018); *Williams v. California*, No. 17-CV-02511-HSG, 2017 WL 5128007, at *4 (N.D. Cal. Nov. 6, 2017); *Millner v. Biter*, No. 113CV02029AWISABPC, 2016 WL 888126, at *1-2 (E.D. Cal. Mar. 9, 2016).

following the attack it was swollen shut for over a month. ER-59, ER-65. Despite this incapacitating injury, prison officials refused to allow Sheltra to file a late grievance.[8] Further administrative remedies were thus unavailable.

## CONCLUSION

For the forgoing reasons, this Court should reverse the district court's grant of summary judgment and remand.

Dated: November 3, 2023   Respectfully submitted,

         By: /s/ Aaron Littman
         **UCLA SCHOOL OF LAW**
         **PRISONERS' RIGHTS CLINIC**
         AARON LITTMAN
         385 CHARLES E. YOUNG DRIVE E
         LOS ANGELES, CALIFORNIA 90095
         (310) 825-9562
         littman@law.ucla.edu

         *Counsel for Plaintiff-Appellant*
         *Shawn Sheltra*

---

[8] The district court faulted Sheltra for inadequately justifying his request for leave to file a late grievance but cited no basis in caselaw for imposing this extra requirement. ER-33-34. Nor is there any basis in the IDOC grievance policy, which states merely that "[t]he review authority may extend the 30-day time limit." ER-96. The policy offers no guidance to prisoners as to what, if anything, they must show in order to obtain an extension, although it does include a "Note" indicating that one possible basis for an extension may be a prisoner "hav[ing] made a reasonable, ongoing attempt to resolve the issue." ER-98. If this was the standard, Sheltra plainly met it. *Cf. Hurst*, 634 F.3d at 411 (observing with disapproval that the district court had allowed "the plaintiff's prison [to] create[] a secret supplement to the state's administrative code" regarding "claims of good cause for [] untimely filing").

**STATEMENT OF RELATED CASES**

The undersigned attorney states the following:

I am unaware of any related cases currently pending in this court.


Dated: November 3, 2023                    /s/ Aaron Littman
                                           Aaron Littman

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32 and 9th Circuit Rule 32, I certify that:

This brief complies with the type-volume limitation of 9th Circuit Rule 32-1(a) because this brief contains 9,144 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

/s/ Aaron Littman
Aaron Littman

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Aaron Littman
Aaron Littman