# No. 21-35374

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

―――――――

**SHAWN SHELTRA,**
*Plaintiff-Appellant,*

*v.*

**JAY CHRISTENSEN, Warden, et al,**
*Defendants-Appellees.*

―――――――

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
CASE NO. 1:20-CV-00215
HON. DAVID C. NYE

―――――――

# APPELLANT'S REPLACEMENT REPLY BRIEF

―――――――

**UCLA SCHOOL OF LAW
PRISONERS' RIGHTS CLINIC**
AARON LITTMAN *
385 CHARLES E. YOUNG DRIVE E
LOS ANGELES, CALIFORNIA 90095
(310) 825-9562
LITTMAN@LAW.UCLA.EDU

COUNSEL FOR PLAINTIFF-APPELLANT
**Shawn Sheltra**

\* This brief was prepared with the assistance of UCLA School of Law Prisoners' Rights Clinic students Ali Massoud and Jack Stephens.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION..............................................................................................1

ARGUMENT ....................................................................................................4

I. Contrary to Appellee's unsupported assertion, the April 17 attack was a direct result of the threats Sheltra documented in his grievance materials. ...................................................................................................4

II. A failure-to-protect claim first arises when a prisoner is exposed to a substantial risk of serious harm; compensable injury is not an element of the constitutional violation. ...........................................................................5

III. The Ninth Circuit has yet to decide whether a prisoner who has properly exhausted must file successive grievances about a continuing violation, and it should join the unanimous consensus of sister circuits and answer in the negative.................................................................................................10

    A. *Ngo v. Woodford* has no bearing on this case. ........................................10

    B. The continuing violations doctrine is not an exception to the PLRA's exhaustion requirement.............................................................14

    C. A unanimous consensus of seven circuits has adopted the continuing violations doctrine..................................................................16

IV. Sheltra could not have exhausted again after the attack because the IDOC grievance process was then unavailable to him. ...................................21

    A. This Court has held that the list of three ways an administrative grievance process can be unavailable outlined in *Ross* is not exhaustive. ...............................................................................................22

    B. IDOC policy prohibited Sheltra from filing successive grievances, and no exceptions applied.......................................................................23

    C. Grave physical injuries prevented Sheltra from filing a timely successive grievance, and Appellees have not met their burden to show that help doing so was available to him.........................................27

CONCLUSION ...............................................................................................29

CERTIFICATE OF COMPLIANCE ..................................................................30

CERTIFICATE OF SERVICE...........................................................................31

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albino v. Baca*,
747 F.3d 1162 (9th Cir. 2014) (en banc)......................................................27, 28

*Andres v. Marshall*,
867 F.3d 1076 (9th Cir. 2017)............................................................................22

*Baker v. Howard*,
No. 2:19-CV-2617-KJM-DMC, 2021 WL 2142734
(E.D. Cal. May 26, 2021) .....................................................................................7

*Becker v. Sherman*,
No. 1:16-CV-828-AWI-JDP, 2018 WL 4616281
(E.D. Cal. Sept. 25, 2018) ...........................................................................13, 15

*Benefield v. McDowall*,
241 F.3d 1267 (10th Cir. 2001)............................................................................6

*Brown v. Oregon Dep't of Corr.*,
751 F.3d 983 (9th Cir. 2014)..............................................................................25

*Calhoun v. DeTella*,
319 F.3d 936 (7th Cir. 2003)................................................................................9

*Carey v. Piphus*,
435 U.S. 247 (1978) .........................................................................................8, 9

*Chappell v. Dickerson*,
No. 1:96-CV-5576-AWI-DLB, 2007 WL 1725683
(E.D. Cal. June 14, 2007) .....................................................................................7

*Collins v. Neal*,
No. 3:17-CV-972-RLM-MGG, 2018 WL 5019520
(N.D. Ind. Oct. 15, 2018) ...................................................................................25

*Cummings v. Connell*,
402 F.3d 936 (9th Cir. 2005)................................................................................9

*Diamond v. Owen*,
  131 F. Supp. 3d 1346 (M.D. Ga. 2015)................................................................19

*Draper v. Coombs*,
  792 F.2d 915 (9th Cir. 1986).................................................................................9

*Farmer v. Brennan*,
  511 U.S. 825 (1994) ................................................................................5, 6, 8, 20

*Floyd v. Laws*,
  929 F.2d 1390 (9th Cir. 1991)..........................................................................9, 10

*Fordley v. Lizarraga*,
  18 F.4th 344 (9th Cir. 2021)................................................................................25

*Garrett v. Stephens*,
  No. 2:13-CV-70, 2014 WL 8272281 (S.D. Tex. Oct. 1, 2014)...........................18

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ............................................................................................11

*Hearns v. Terhune*,
  413 F.3d 1036 (9th Cir. 2005)............................................................................25

*Hemphill v. New York*,
  380 F.3d 680 (2d Cir. 2004)...............................................................................28

*Howard v. Waide*,
  534 F.3d 1227 (10th Cir. 2008)......................................................................17, 20

*Hunter v. Rohrer*,
  No. 3:18-CV-05198-BHS-JRC, 2021 WL 4067463
  (W.D. Wash. Apr. 21, 2021) ............................................................................5, 13

*Hutto v. Finney*,
  437 U.S. 678 (1978) ............................................................................................25

*Johnson v. Johnson*,
  385 F.3d 503 (5th Cir. 2004).........................................................12, 16, 17, 18

*Johnson v. Killian*,
  680 F.3d 234 (2d Cir. 2012)...........................................................................17, 19

*Kaba v. Stepp*,
  458 F.3d 678 (7th Cir. 2006)........................................................28, 29

*Lancaster v. Rodriguez*,
  701 F.2d 864 (10th Cir. 1983)................................................................9

*Marella v. Terhune*,
  568 F.3d 1024 (9th Cir. 2009) (per curiam)......................................23

*McElyea v. Babbitt*,
  833 F.2d 196 (9th Cir. 1987)................................................................5

*Morgan v. Trierweiler*,
  67 F.4th 362 (6th Cir. 2023)..............................................12, 13, 17

*Ngo v. Woodford*,
  539 F.3d 1108 (9th Cir. 2008)....................................................10, 11

*Parzyck v. Prison Health Servs., Inc.*,
  627 F.3d 1215 (11th Cir. 2010)........................................13, 15, 17, 18

*Porter v. Nussle*,
  534 U.S. 516 (2002) ...........................................................................16

*Ramirez v. Young*,
  906 F.3d 530 (7th Cir. 2018)..............................................................22

*Ramos v. Lamm*,
  639 F.2d 559 (10th Cir. 1980)..............................................................6

*Reed v. Wash. State Dep't of Corr.*,
  No. 3:16-CV-05993-BHS-DWC, 2021 WL 8086628
  (W.D. Wash. Apr. 16, 2021) ..............................................................14

*Ross v. Blake*,
  578 U.S. 632 (2016) ...........................................................................14

*Schiro v. Clark*,
  No. 3:10-CV-00203-RCJ, 2011 WL 7116315
  (D. Nev. Dec. 8, 2011) .........................................................................7

*Sernas v. Cantrell*,
  857 F. App'x 400 (9th Cir. 2021) .......................................................20

*Spain v. Procunier*,
  600 F.2d 189 (9th Cir. 1979)...............................................................................25

*Surles v. Andison*,
  678 F.3d 452 (6th Cir. 2012)...............................................................................28

*Temple v. Adams*,
  No. CV-F-04-6716-OWW-DLB, 2006 WL 2454275
  (E.D. Cal. Aug. 23, 2006) ......................................................................................7

*Turley v. Rednour*,
  729 F.3d 645 (7th Cir. 2013)............................................................. 13, 17, 19

*Turner v. Burnside*,
  541 F.3d 1077 (11th Cir. 2008)...........................................................................28

*Wilcox v. Brown*,
  877 F.3d 161 (4th Cir. 2017)................................................................... 13, 17

*Williams v. Priatno*,
  829 F.3d 118,124 (2d Cir. 2016)........................................................................22

**INTRODUCTION**

For a month and a half, Shawn Sheltra properly exhausted the IDOC grievance process, notifying defendants of their failure to protect him from incessant threats of imminent attack. The final threat included an ultimatum: Sheltra could pay $100 by April 10, or he would be assaulted. Sheltra told defendants he would not be extorted. Just one week later on April 17, he was beaten so badly he was left temporarily blind. After the attack, Sheltra was not required to exhaust again; his first grievance gave defendants ample notice to process his safety concerns and take protective action. And, even if he were required to exhaust again, IDOC policies proscribing successive grievances and his incapacitating injuries rendered the process unavailable.

In disputing these positions, Appellees advance several specious arguments.

First, Appellees state that the threats Sheltra documented were unrelated to the attack, but they identify no basis in the record for that assertion. Instead, they rely exclusively on one fact derived from the initial complaint—that Sheltra's grievance did not explicitly name the assailant—to argue that the threats in his grievance were unrelated to the assault. But Sheltra was not required to name his attacker-to-come in his grievance. More importantly, his grievance materials *and* his verified amended complaint demonstrate that the threats of extortion and assault

directly led to the eventual attack. Appellees pay these determinative materials scant attention.

Second, Appellees argue that compensable injury is a necessary element of failure-to-protect violations, such that Sheltra's claim cannot have arisen prior to the attack. This position is explicitly rejected by the Supreme Court in *Farmer*. It also ignores binding precedent from this Court underscoring the distinction between a constitutional violation and relief sought for injuries *caused* by that violation. Once the defendant officials knowingly exposed him to a substantial risk of serious harm, an actionable violation occurred.

Third, Appellees argue that *Ngo v. Woodford* forecloses adoption of the continuing violations doctrine endorsed by all seven circuits to consider the issue. This is wrong. *Ngo* answered an entirely different question. It asked if during an ongoing deprivation, a prison's limitations period for submitting a grievance restarted each day the relevant ban continued to be in effect. But the relevant question at the core of this case—if during an ongoing violation, a successive grievance is necessary to exhaust—was not addressed. Therefore, *Ngo* does not control, and the relevant doctrine remains a matter of first impression for this Court. The Court should make clear that while proper exhaustion is required, infinite exhaustion is not.

Fourth, Appellees responses to Sheltra's unavailability arguments—that he could not have pursued administrative remedies following the attack due to an IDOC policy prohibiting successive grievances and because he had been blinded—fare no better. They contend that his arguments fail because they do not fall within any of the three unavailability categories set out in *Ross v. Blake*, ignoring the fact that this Court has characterized *Ross*'s list as non-exhaustive. Because a fair interpretation of their own policies makes clear that Sheltra was prohibited from filing a successive grievance about the ongoing failure to protect him once he had fully exhausted, Appellees propose contorted readings of their regulations and argue that Sheltra should somehow have divined them. Lastly, unable to dispute Sheltra's post-attack blindness, Appellees argue that assistance in filing a grievance was available to him, drawing a questionable inference from the availability of help drafting the complaint in this lawsuit. This is insufficient to meet their burden of proof.

For the reasons stated in the opening brief—which remain unmarked by Appellees' hollow rebuttals—and for those that follow, the district court's grant of summary judgment to the defendants should be reversed as to Sheltra's individual-capacity claims.[1]

---

[1] Sheltra does not contest dismissal of his official-capacity claims. *See* AB 29-30.

# ARGUMENT

**I.   Contrary to Appellee's unsupported assertion, the April 17 attack was a direct result of the threats Sheltra documented in his grievance materials.**

From February 14 to March 31, 2020, Sheltra filed six concern forms, a grievance, and an appeal documenting repeated threats of extortion and assault. In the grievance, he notified Appellees that he had already been forced to pay $30. ER-45. In the appeal, he warned Appellees that he had been given an ultimatum: pay another $100 by April 10 or be attacked. ER-46. Sheltra told Appellees that he refused to pay. *Id*. And on April 17—just one week after the deadline in his grievance—he was attacked. ER-65, ER-133.

Sheltra's grievance and the resultant attack are clearly linked, but Appellees nonetheless proclaim that the attack "was a different claim and different situation with different facts and inmates at issue from [Sheltra's] previous grievances." AB 20. Their sole support for this assertion is that the eventual assailant was not one of the three prisoners named in the grievance materials. *Id.* at 4, 5, 6, 20, 27. Beyond this, they cannot point to a shred of record evidence to suggest that the attack Sheltra suffered was something other than the result of the extortion scheme he described in his grievances. In short, they offer mere argument of counsel.

Furthermore, Sheltra directly rebuts Appellees' contention in his verified amended complaint. There, he states "that on April 17th, 2020, [he] was violently assaulted by an inmate who was paid to assault [him] by the person [he] had

4

reported to staff that [he] had problems with." ER-133. Sheltra also alleges that the attack occurred because defendants "did nothing to protect [him] from the harm that [he] described would occur if [he] was not moved." *Id*. These statements refute Appellees' unsupported contention that the attack was "wholly new terrain." AB 27. Because a verified complaint may be used to oppose summary judgment, *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987), Sheltra has, at a minimum, generated an issue of material fact as to whether the attack was a continuation of the ongoing threats of extortion and assault that he diligently documented. *See Hunter v. Rohrer*, No. 3:18-CV-05198-BHS-JRC, 2021 WL 4067463, at *10 (W.D. Wash. Apr. 21, 2021) (denying summary judgment where prisoner generated material issue of fact regarding whether his grievance put prison officials on notice of a continuing violation).

## II. A failure-to-protect claim first arises when a prisoner is exposed to a substantial risk of serious harm; compensable injury is not an element of the constitutional violation.

Appellees' position that "[u]ntil there are damages, there is no claim" is incorrect as a matter of law. AB 11. This is so for two reasons. First, such an argument is foreclosed by the plain language of the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825 (1994). Second, by focusing exclusively on compensatory damages and ignoring the potential for nominal damages, Appellees

5

overlook binding caselaw that distinguishes between a constitutional violation and the relief requested for compensable injuries caused by that violation.

By sidestepping its plain text, it is Appellees who misunderstand *Farmer*. There, the Court was clear that, to establish an Eighth Amendment violation, plaintiffs must show that "the official knows of and disregards an excessive *risk* to inmate health or safety." *Farmer*, 511 U.S. at 837 (emphasis added). As mentioned in the opening brief, OB 16, the Court was careful to note that prisoners need not "await a tragic event such as an actual assault before obtaining relief." *Farmer*, 511 U.S. at 845 (cleaned up) (quoting *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993)). They must only show that they were subjected to a substantial risk of serious harm; that harm need not materialize to state an Eighth Amendment violation.

Faced with an argument similar to Appellees', the Tenth Circuit has explicitly elaborated upon this doctrine, highlighting the Supreme Court's clear rejection of "the notion that the Eighth Amendment does not reach official conduct that 'is sure or very likely to cause' serious injury at the hands of other inmates." *Benefield v. McDowall*, 241 F.3d 1267, 1272 (10th Cir. 2001) (quoting *Helling*, 509 U.S. at 33). As such, it held that an actual assault was not necessary to make out a failure-to-protect claim, reasoning that "a violation of the Eighth Amendment does not turn on the type [of] relief sought." *Id.*; *see also Ramos v. Lamm*, 639 F.2d

6

559, 572 (10th Cir. 1980) (noting that a prisoner "does not need to wait until he is actually assaulted before obtaining relief").

Similarly, several district courts in the Ninth Circuit have concluded that failure-to-protect claims arise before any compensable injury is suffered. In *Temple v. Adams*, for example, the court stated that "[a] claim against a government official for failure to protect the plaintiff accrues at the moment when a defendant fails to act, not when the plaintiff later suffers an injury." No. CV-F-04-6716-OWW-DLB, 2006 WL 2454275, at *10 (E.D. Cal. Aug. 23, 2006). And in *Chappell v. Dickerson*, the court stated that "proof of an injury is not a required element in a failure to protect claim." No. 1:96-CV-5576-AWI-DLB, 2007 WL 1725683, at *3 (E.D. Cal. June 14, 2007); *see also Baker v. Howard*, No. 2:19-CV-2617-KJM-DMC, 2021 WL 2142734, at *10 (E.D. Cal. May 26, 2021) ("An Eighth Amendment failure to protect claim involves risk to an inmate, *not necessarily* completed harm."), *report and recommendation adopted*, 2021 WL 2894118 (E.D. Cal. July 9, 2021); *Schiro v. Clark*, No. 3:10-CV-00203-RCJ, 2011 WL 7116315, at *6 (D. Nev. Dec. 8, 2011), *report and recommendation adopted*, 2012 WL 275392 (D. Nev. Jan. 31, 2012).

Appellees' answering brief completely ignores the above-mentioned principle from *Farmer*. Nor does it cite any relevant caselaw—from this Court or any other circuit—to substantiate the position that failure-to-protect violations only

7

materialize upon the occurrence of compensable injury. Instead, it relies on an irrelevant statement from *Farmer*. AB 11. This statement has nothing to do with whether compensable injury is required to state an Eighth Amendment violation. Read in context, the principle that "only inflictions of punishment carry liability," *Farmer* 511 U.S. at 841, is merely one of the Court's justifications for adopting a subjective test to govern the deliberate indifference analysis. In other words, contrary to Appellees' argument, *Farmer* holds that knowingly exposing a prisoner to a substantial risk of serious harm *is* an infliction of punishment.

Along with contradicting *Farmer*, Appellees' contention that compensable injury is an element of a failure-to-protect claim misunderstands the distinction between a constitutional violation and relief sought for compensable injuries caused by such violations.

In *Carey v. Piphus*, the Supreme Court explained that, under Section 1983, compensatory damages are available "for actions 'found . . . to have been violative of . . . constitutional rights *and to have caused compensable injury*.'" 435 U.S. 247, 255 (1978) (quoting *Wood v. Strickland*, 420 U.S. 308, 319 (1975)). Put simply, whether a constitutional violation has occurred and whether that violation caused compensable injury are distinct questions. The Court went on to hold that, even though the plaintiffs could not prove actual injury (which would qualify them for compensatory damages), they were still entitled to pursue nominal damages to

8

vindicate the procedural due process violation. *Id.* at 266. Allowing for nominal

damages in such cases balances the "importance to organized society that . . . rights

be scrupulously observed" with "the principle that substantial damages should be

awarded only to compensate actual injury." *Id.*; *see also Cummings v. Connell*, 402

F.3d 936, 942 (9th Cir. 2005) (citing *Carey*, 435 U.S. at 266) ("[N]ominal damages

are awarded to vindicate rights, the infringement of which has not caused actual,

provable injury."). Appellees ignore this basic distinction.

Subsequently, this Court clarified that *Carey*'s holding is not limited to

procedural due process violations and extends to all constitutional rights. *Draper v.*

*Coombs*, 792 F.2d 915, 921 (9th Cir. 1986); *see also Floyd v. Laws*, 929 F.2d

1390, 1402-03 (9th Cir. 1991) (reiterating *Draper*'s conclusion and holding that

when there a constitutional violation is established, nominal damages are

mandatory, not permissive). In reaching this conclusion, the *Draper* Court

explicitly adopted the Tenth Circuit's approach in *Lancaster v. Rodriguez*, which

held that nominal damages were appropriate for plaintiffs who establish an Eighth

Amendment violation but fail to prove actual damages. *Draper*, 792 F.2d at 921-22

(citing *Lancaster*, 701 F.2d 864, 866 (10th Cir. 1983)). Numerous other circuits

have likewise held that nominal damages are available for Eighth Amendment

violations when prisoners cannot establish compensable harm. *Calhoun v. DeTella*,

319 F.3d 936, 942 (7th Cir. 2003) (collecting cases).

That Eighth Amendment claims can be vindicated without a showing of compensable harm vitiates Appellees' contention that "the elements of [Sheltra's] claim for deliberate indifference includes actual damages." AB 12. The violation of Sheltra's Eighth Amendment rights arose as soon as defendants were on notice that he was exposed to a risk of serious harm but failed to protect him. The fact that this violation continued and that Sheltra sought compensatory damages for the actual harm—grave physical injury—that subsequently resulted has no bearing on when the violation first occurred. *Cf. Floyd*, 929 F.2d at 1403 ("That a jury might choose to award zero actual damages is irrelevant to the legal question of whether, on the basis of the jury's verdict, the plaintiff was entitled to judgment and nominal damages.").

**III. The Ninth Circuit has yet to decide whether a prisoner who has properly exhausted must file successive grievances about a continuing violation, and it should join the unanimous consensus of sister circuits and answer in the negative.**

**A. *Ngo v. Woodford* has no bearing on this case.**

Appellees' insistence that *Ngo v. Woodford*, 539 F.3d 1108 (9th Cir. 2008), should control the outcome of this appeal is mistaken. AB 13-17. In fact, *Ngo* has no bearing whatsoever on this case. *Ngo* says that a prisoner may not delay in exhausting because a violation continues, *id.* at 1109; it says nothing about whether a prisoner who has already properly exhausted must do so again—and again— because the violation of which he has grieved continues.

10

Part of Appellees' confusion can be attributed to the fact that there are two distinct doctrines related to continuing violations. The first is applied in the statute of limitations context. This familiar version posits that if a violation is ongoing, the limitations period restarts each day that the violation continues. *See*, *e.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982) (holding that when an "unlawful practice . . . continues into the limitations period," the limitations period restarts after each "asserted occurrence of that practice").

In *Ngo*, this Court refused to apply this version of the doctrine to extend the deadline by which a prisoner must exhaust. There, the plaintiff attempted to appeal a ban from special programs five months after the initial determination. 539 F.3d at 1109. He argued that, because this determination constituted a "continuing violation of his constitutional rights," the 15-day limitations period restarted each day that the ban remained in effect. *Id*. The Court rejected this argument, reasoning that Ngo had "notice . . . that he was subject to an indefinite restriction" on the day that restriction was decided. *Id.* Therefore, he was required to appeal that decision within 15 working days of the date he learned of it. *Id*. Because he did not adhere to the prison's internal timelines, he failed to properly exhaust and was barred from suing in federal court. *Id*.

It is uncontested that Sheltra's March 10 grievance was timely—that is, Appellees never suggest that he grieved too *late*. So he does not present this

11

species of continuing violations argument. Instead, he advocates for the adoption of a distinct doctrine. As argued in the opening brief, OB 21-25, the rule endorsed by every circuit to consider the question instructs that where there is "'one, continuing harm' or a single course of conduct (which can lead to discrete incidents of harm), filing repeat grievances is unnecessary." *Morgan v. Trierweiler*, 67 F.4th 362, 369-70 (6th Cir. 2023). *Ngo* has nothing to say about this second iteration of the continuing violations doctrine. Unlike Sheltra, the *Ngo* plaintiff never properly filed a single grievance. Consequently, whether the PLRA required him to submit a second, successive grievance was not a question before that panel.

Perhaps the best evidence that these two doctrines are distinct comes from the Fifth Circuit in *Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004). In that case, the prisoner's grievance was filed well after a continuing violation had commenced and well before it ended. The court expressly considered and decided *both* a *Ngo*-style argument about the retrospective effect of the grievance *and* an argument, akin to that advanced here, about that grievance's prospective effect. It held, consistent with *Ngo* (which it preceded), that this grievance failed to exhaust with respect to events occurring long prior to its filing. *Id.* at 519. And it simultaneously held, as recounted in the opening brief, that this grievance sufficed to exhaust with respect to the rest of the violation that followed. *Id.* at 519-21.

The inapplicability of *Ngo* to this appeal is further evidenced by the fact that it has gone unmentioned in the four circuits that have adopted the rule for which Sheltra advocates since *Ngo* was initially published in 2008. *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215 (11th Cir. 2010); *Turley v. Rednour,* 729 F.3d 645 (7th Cir. 2013); *Wilcox v. Brown*, 877 F.3d 161 (4th Cir. 2017); *Morgan*, 67 F.4th 362. Given *Ngo*'s high-profile status on remand from the Supreme Court and its rejection of an identically named but distinct theory, it strains credulity to suggest that four circuits—all of which surveyed the state of the law in other courts of appeal—merely overlooked contrary authority in an influential sister circuit. More realistically, such silence tacitly confirms that *Ngo*'s reasoning has no purchase in this context.

District courts in the Ninth Circuit have similarly not regarded *Ngo* as applicable when considering whether a prisoner who has already exhausted must do so again. In fact, three of these decisions—all of which were issued post-2008—explicitly concluded that the Ninth Circuit has yet to reach the question. Most recently, in *Hunter,* the court noted that "[a]lthough the Ninth Circuit has not spoken on this issue, other circuit courts have held that prisoners 'need not file multiple, successive grievances raising the same issue . . . if the objectionable condition is continuing.'" 2021 WL 4067463, at *10 (citing *Turley*, 729 F.3d at 649); *see also Becker v. Sherman*, No. 1:16-CV-828-AWI-JDP, 2018 WL

13

4616281, at *5 (E.D. Cal. Sept. 25, 2018); *Reed v. Wash. State Dep't of Corr.*, No. 3:16-CV-05993-BHS-DWC, 2021 WL 8086628, at *11 (W.D. Wash. Apr. 16, 2021), *report and recommendation adopted in relevant part*, 2022 WL 970148 (W.D. Wash. Mar. 31, 2022). That multiple courts bound by Ninth Circuit holdings have not seen *Ngo* as on-point further undermines appellees' assertion that this Court "has already expressly rejected" the continuing violations doctrine. AB 15.

> **B.** **The continuing violations doctrine is not an exception to the PLRA's exhaustion requirement.**

Throughout their answering brief, Appellees characterize the continuing violations doctrine as an "exception." AB 13, 15, 18, 19. This characterization is incorrect. And it represents a desperate attempt from Appellees to manufacture circuit opposition where none exists. In reality, Sheltra's point stands: the continuing violations doctrine has been unanimously adopted by all seven circuits to reach the question.

Along with erroneous reliance on *Ngo*, Appellees claim to cite to "contrary decisions of the Third, Fourth, and Seventh Circuits." AB 18. Conspicuously, they provide no analysis, instead opting to quote each circuit's prefatory reminder that unavailability is the exhaustion requirement's sole exception. *Id*. at 17-18. In other words, Appellees conjure three circuit cases—none of which mentions the continuing violations doctrine or involves any relevant fact pattern—to reiterate the Supreme Court's holding in *Ross v. Blake*, 578 U.S. 632 (2016). *Ross,*

however, is inapposite to this aspect of the present dispute. By extension, the allegedly "contrary" caselaw upon which Appellees rely does not disrupt the unanimity of circuit adoption.

By urging this Court to adopt the continuing violations doctrine, Sheltra does not seek an exception to the mandatory exhaustion requirement. Such an exception would only be necessary if Sheltra's pre-attack grievance materials failed to comply with internal IDOC policies (as the parties agree, it did comply) and he nonetheless sought redress in court. In stark contrast, the continuing violations doctrine instructs that, where a prisoner's *proper exhaustion* adequately notifies prison officials of a single, ongoing harm, he or she does not need to grieve a second (or third) time.

As explained in the opening brief, OB 23, such a rule is perfectly aligned with the PLRA's purpose. *Parzyck*, 627 F.3d at 1219 (holding that successive grievances were unnecessary because the plaintiff's initial submission "accomplished §1997e(a)'s purpose by alerting prison officials to the problem and giving them the opportunity to resolve it before being sued"). Rather than excepting prisoners from the exhaustion requirement, the continuing violations doctrine closely tracks the PLRA's logic to avoid an illogical regime wherein they are forced to repeatedly grieve the same ongoing harms, ad infinitum. *Becker*, 2018

WL 4616281, at *6 (holding that "*Ross* does not foreclose application of the outside-circuits' 'continuing violation' theory").

## C. A unanimous consensus of seven circuits has adopted the continuing violations doctrine.

Appellees' various attempts to undermine the unanimous adoption of the continuing violations doctrine, AB 18-23, are unavailing. Contrary to their assertions, this Court's sister circuits have adopted and developed the doctrine, which is neatly aligned with the PLRA's goal of "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 525 (2002).

First, Appellees argue that the Fifth Circuit's decision in *Johnson* does not adopt the continuing violations doctrine because it notes that Texas prisons' procedures barred repetitive grievances. AB 18-19. This reading is contradicted by *Johnson*'s plain text. Just before the single, ancillary line cited by Appellees, the Fifth Circuit stated that "Johnson could not have been expected to file a new grievance every fifteen days, or each time he was assaulted . . . for the entire period during which he remained unprotected in the general population." 385 F.3d at 521. It cited numerous other courts' successive-grievance-policy-independent holdings to this effect. *Id*. And immediately after the line Appellees cite, the Court reiterated its primary holding, crystallizing its articulation of the continuing violations doctrine: "[W]e do not believe that he was required to file repeated grievances

16

reminding prison officials that he remained subject to attack in the general population. Johnson's grievances were sufficient to exhaust claims that arose from the same continuing failure to protect him from sexual assault." *Id*. A comprehensive reading makes clear that the *Johnson* court pointed to the prison's policy on successive grievances to show its consistency with the decision's primary holding—that the plaintiff was not required to file successive grievances to remind officials of the ongoing violation.

Notably, this Court's sister circuits agree with such a characterization of *Johnson*. Each of the six circuits to subsequently adopt the continuing violations doctrine in this context have cited *Johnson* to support their position. *Howard v. Waide*, 534 F.3d 1227, 1244 (10th Cir. 2008); *Parzyck*, 627 F.3d at 1219; *Johnson v. Killian*, 680 F.3d 234, 239 n.5 (2d Cir. 2012); *Turley*, 729 F.3d at 650; *Wilcox*, 877 F.3d at 167 n.4 (citing *Turley*, 729 F.3 at 650 (collecting cases including *Johnson*)); *Morgan*, 67 F.4th at 370.

Appellees similarly attempt to argue that *Parzyck* "is not [an] application of" the continuing violations doctrine. AB 21. Yet again, Appellees fixate on one of the Eleventh Circuit's multiple holdings and ignore the part of the case that is squarely on point. It is true, as Appellees observe, that the *Parzyck* court stated that prisoners need not name particular defendants to properly exhaust—but it then proceeded to apply the continuing violations doctrine. Just one paragraph later,

17

citing both *Howard* and *Johnson*, it held that "Parzyck was not required to initiate another round of the administrative grievance process on the exact same issue each time another request for an orthopedic consultation was denied." *Parzyck*, 627 F.3d at 1219. Because he "gave prison officials ample opportunity to respond internally" before suing, successive grievances were unnecessary. *Id*. This is a textbook application of the doctrine.

Additionally, by suggesting that footnote 13 in *Johnson* undermines its adoption of the continuing violations doctrine, AB 18, Appellees misinterpret the Fifth Circuit's imposition of limits on the doctrine's application as a categorical bar on its use. Properly construed, this note merely recognizes that the continuing violations doctrine has bounds. Specifically, the doctrine's invocation in response to "one particular incident" does not "*automatically* exhaust claims that that arise from future incidents of the same general type." *Johnson*, 385 F.3d at 521 n.13 (emphasis added). Moreover, "discrete incident[s]" may sometimes "reflect[] a different type of problem that would require a different grievance." *Id*.

Lower courts applying *Johnson* have agreed with this reading. For instance, in *Garrett v. Stephens*, the magistrate relied on footnote 13 to hold that the prisoner's 2009 grievance regarding sleep deprivation in a cell did not obviate the need to file a 2012 grievance regarding sleep deprivation after he had been transferred to a dorm. No. 2:13-CV-70, 2014 WL 8272281, at *4-5 (S.D. Tex. Oct.

18

1, 2014). And in *Diamond v. Owen*, the court interpreted footnote 13 to limit *Johnson*'s holding to "continuing violations of the same issue . . . where the inmate remained in the same situation or where subsequent conduct at the same prison occurred within a short duration." 131 F. Supp. 3d 1346, 1363 (M.D. Ga. 2015).

Other circuits have similarly provided contours to facilitate reasonable application of the doctrine. The Second Circuit, for example, noted that its "holding is necessarily limited to cases in which a prior grievance identifies a specific and continuing complaint." *Killian*, 680 F.3d at 239. Likewise, the Seventh Circuit has stated that "[s]eparate complaints about particular incidents are . . . required if the underlying facts or the complaints are different." *Turley*, 729 F.3d at 650. Such limiting principles do not help Appellees. In fact, they further underscore the continuing violations doctrine's alignment with the PLRA's stated purpose; successive grievances are only unnecessary where prisoners have given officials notice of, and an opportunity to correct, a particular ongoing violation.

Finally, Appellees concede that the *Howard*, *Killian*, and *Morgan* courts have adopted the continuing violations doctrine. AB 20, 23. Sidestepping this concession, they argue that, even if the doctrine were applied properly in these cases, application is improper here because Sheltra was not subject to a continuing violation. *Id.* Relying on a single fact—that Sheltra did not name his assailant in his March 10 grievance—Appellees' leap to assert that the April 17 attack "was a

19

different claim and different situation with different facts and inmates." AB 20. This argument is wrong for two reasons.

First, Appellees' suggestion that Sheltra was required to name the specific assailant is directly foreclosed by *Farmer*. There, the Court concluded that prison officials may not escape liability by showing they "did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." 511 U.S. at 843; *see also Sernas v. Cantrell*, 857 F. App'x 400, 401 (9th Cir. 2021). Though it goes unmentioned in the answering brief, the Tenth Circuit echoes this exact rule in *Howard*: "[The prisoner] is certainly not required to give notice of who precisely is behind the threat." 534 F.3d at 1240. Therefore, Appellees' position that Sheltra was required to name Goecker in his pre-attack submissions would require more precise notice in his grievance than would be necessary to establish liability on the merits. This cannot be right.

Second, despite Appellees' bare assertions to the contrary, Sheltra has demonstrated that he was subject to a continuing violation. As explained *infra* Section I, the April 17 attack was the anticipated result of the concerted threat campaign Sheltra documented in the grievance process the prior month. And, as alleged in the verified amended complaint, the attack was carried out by an assailant paid by a prisoner that had previously threatened him and whom he had

previously identified. ER-65, ER-133. At a bare minimum, then, Sheltra has generated a dispute of fact as to whether the attack was a materialization of threats he previously reported. That he did not name the individual perpetrator of the physical violence does nothing to undermine this conclusion.

**IV.  Sheltra could not have exhausted again after the attack because the IDOC grievance process was then unavailable to him.**

Even if Sheltra had been required to exhaust again after the April 17 attack, he could not have done so—first, because of IDOC prison policy barring successive grievances, and second, because of his incapacitating physical injuries. Appellants argue that there are only three ways a grievance process can be unavailable, and that any argument Sheltra advances must fit within one of them.[2] But this Court has held that those three categories are not exhaustive. Here, IDOC policy prohibited Sheltra from filing a successive grievance about the same issue (failure to protect) after the attack, and no exceptions applied. Additionally, Sheltra was temporarily blinded in the attack and thereby prevented from filling out a grievance form himself; Appellees have not shown that someone else was willing and able to draft and file one on his behalf.

---

[2] Appellees also argue that because Sheltra had "previously used IDOC procedures to obtain relief twice in the record," relief was similarly available to him in April 2020. AB 25. Of course, the mere fact that a prisoner used a grievance procedure to obtain relief *previously* has no bearing on its availability in *future* incidents if the conditions that make it unavailable in the future (here, having already grieved the issue and being incapacitated by grave injury) did not exist in the past.

21

**A.** **This Court has held that the list of three ways an administrative grievance process can be unavailable outlined in *Ross* is not exhaustive.**

Appellees suggest that there are only three ways in which an administrative remedy can be unavailable under *Ross* and premise their argument on the assumption that Sheltra's case relies on the third exception: "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." AB 26 (citing *Ross*, 578 U.S. at 644). This is incorrect.

This Court has characterized the list in *Ross* as "non-exhaustive."[3] *Andres v. Marshall*, 867 F.3d 1076, 1078 (9th Cir. 2017). Sister circuits agree. *Ramirez v. Young*, 906 F.3d 530, 538 (7th Cir. 2018) (concluding that *Ross*'s three circumstances "were only examples, not a closed list, and to the extent the district court thought they were the latter, it erred"); *Williams v. Priatno*, 829 F.3d 118,124 n.2 (2d Cir. 2016) (observing that "the three circumstances discussed in *Ross* do not appear to be exhaustive").

The basis for unavailability Sheltra asserts does not fall within the three *Ross* categories; rather, he points to precedent holding that when a prisoner is made to understand that an issue may not be grieved or appealed—either as a general

---

[3] Due to an editing error, the opening brief mistakenly cited *Ross* itself for this proposition; the quoted language appears in this Court's decision in *Andres*, which the brief cited two sentences later. OB 31–32.

matter or in his particular case—administrative remedies are unavailable. OB 33; *Marella v. Terhune*, 568 F.3d 1024, 1027 (9th Cir. 2009) (per curiam) (reversing the district court's dismissal of a prisoner's claim for failure to exhaust because the prisoner had been "reliably informed" that his action could not be appealed).

Appellees fail to grapple with any of the caselaw Sheltra cites for the proposition that when prison policies categorize certain issues as non-grievable, remedies are unavailable. Instead, they argue that "[t]he facts in the record . . . do not support Appellant's argument that IDOC officials told him that he could not file a grievance." AB 26. While Sheltra was not told by individual dictate, he was informed by broadly applicable IDOC policy that "[a]fter an issue has been reviewed at the appellate level and all administrative review process remedies exhausted, a new [grievance] . . . that addresses the same issue will be rejected." ER-92. Confronted with this rule, a reasonable prisoner in Sheltra's shoes would have concluded that he was not permitted to file a post-attack grievance about defendants' failure to protect him from the harm of which he had been warning them for weeks.

> **B.** **IDOC policy prohibited Sheltra from filing successive grievances, and no exceptions applied.**

Appellees next contend that Sheltra would have been permitted to file a successive grievance—notwithstanding their overarching policy to the contrary—because, they say, two exceptions would have applied. These exceptions cover

23

situations "[w]hen a specific issue was not addressed in a previous grievance even though the issue was based on the same incident," and "[w]hen time has elapsed that might affect the issue." AB 27.

First, Appellees suggest that the attack on April 17 was an "issue . . . not addressed in a previous grievance." AB 27. But Sheltra *did* address an imminent attack in his concern forms, grievance, and appeal. He gave IDOC prison officials ample notice that a specific threat would materialize. Short of predicting the exact date on which the attack would occur, there was nothing further Sheltra could have done to grieve the issue. The plain terms of this exception, by contrast, cover circumstances where multiple discrete concerns stem from the same occurrence. For example, had Sheltra complained about inadequate treatment for his head injury after the attack, he would have been raising a new issue (medical care) based on the same failure to protect him. The complaint at the heart of this lawsuit, however, would not have fallen within this exception.

Second, Appellees argue that "one month elapsed between the March grievance and the assault" and that "the mere passage of time would have" "provide[d] a new justification for a grievance." AB 27. As Appellees read it, the exception completely swallows the rule—(some amount of) time is always passing. Sheltra could not be expected to read an IDOC policy prohibiting prisoners from filing repeated grievances in such an absurdly permissive way. A fair reading of

24

the IDOC policy permits successive grievances only "[w]hen time has elapsed *that might affect the issue.*" ER-92 (emphasis added). *See Fordley v. Lizarraga*, 18 F.4th 344, 357 (9th Cir. 2021) (refusing to apply prison officials' unreasonable interpretation of grievance regulations).[4]

The passage of time is indeed critical to many conditions-of-confinement claims. *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978) ("A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); *see also Brown v. Oregon Dep't of Corr.*, 751 F.3d 983, 988 (9th Cir. 2014) ("There is a crucial factor distinguishing [solitary] confinement . . . the duration of Brown's confinement."); *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005) (overturning dismissal of a prisoner's complaint regarding nonworking toilets and a lack of cold water during extreme heat because the district court "did not take into account the nine month period in which [the prisoner] was subjected to these conditions of confinement"); *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (affirming order to "accord plaintiffs the right of outdoor exercise one hour per day, five days a week" if

---

[4] Confronted with prison officials' similarly "perplexing" interpretations of their own grievance regulations, some courts have expressly concluded that the policy "either didn't apply [to the prisoner's claim] or was so opaque as to be practically unavailable." *Collins v. Neal*, No. 3:17-CV-972-RLM-MGG, 2018 WL 5019520, at *3 (N.D. Ind. Oct. 15, 2018).

prisoners were to be confined for long periods of time). By contrast, Sheltra's failure-to-protect claim here has no durational element.

Appellees also seem to argue that the fact that Sheltra "asked for relief by concern form or grievance eight times" and "only one was denied as duplicative" is evidence that a post-attack grievance about the ongoing failure to protect him would not have been denied as duplicative. AB 26. This argument fails for two reasons. First, Appellees own policies required repetition up until the point of exhaustion and then prohibited it after that. ER-92. Sheltra filed multiple forms raising the same issue because that is what IDOC grievance procedures demanded he do in order to properly exhaust—once. ER-91. His concern forms, grievance, and appeal all dealt with the same subject: a campaign of extortion and defendants' failure to protect him therefrom. ER-45-53. After the appeal—the final step in the exhaustion process—any *further* requests for relief would have been denied as duplicative. ER-92. Second, even if the record did reflect that defendants did not always follow the plain language of their bar on successive grievances, Sheltra cannot reasonably be expected to assume they would disregard it.

Because the claim Sheltra actually raises in this case does not fall within a fair construction of either exception, he could not have filed a successive grievance following the attack, thus rendering the process unavailable to him.

26

**C.** **Grave physical injuries prevented Sheltra from filing a timely successive grievance, and Appellees have not met their burden to show that help doing so was available to him.**

Though they impugn it, Appellees offer no rebuttal to the statement in Sheltra's verified complaint that the attack left him blinded and that he did not recover any sight until after the time period for filing a post-attack grievance had passed. AB 28, ER-133. Instead, they argue that even blindness did not render administrative remedies unavailable, because—they contend—"he could have still timely grieved the assault . . . with the assistance of another inmate." AB 28. Their only evidence of this: that he was able to obtain the assistance of another prisoner in filing the complaint in this lawsuit.[5] *Id.*

Non-exhaustion is an affirmative defense; Appellees bear the "burden . . . to prove that there was an available administrative remedy." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc). If they can do so, Sheltra then has the "burden of production . . . to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id*. He has done so: there

---

[5] Appellees also point to an IDOC policy stating that prisoners "shall be *allowed* to have another offender write the concern or grievance for[m]" in case of physical disability. ER-95 (emphasis added). But allowing injured prisoners to get help is not the same as guaranteeing access to assistance; this policy is necessary but not sufficient to rebut Sheltra's argument that his blindness rendered the process unavailable.

27

is no dispute that he was blinded. Now, the burden returns to Appellees. *Id.* ("[T]he ultimate burden of proof remains with the defendant.") They must—and cannot— show the "absence of a genuine dispute of material fact" as to exhaustion. *Surles v. Andison*, 678 F.3d 452, 456 (6th Cir. 2012).

Appellees have not shouldered their burden because there is at least a dispute of fact as to whether Sheltra could have obtained help filing a grievance after his injury. Appellees assume that because Sheltra was able to find help filing a *lawsuit*, he could have gotten help filing a *grievance*. This does not necessarily follow. The incentives and disincentives—such as the prospect of compensation and the threat of retaliation—for a sighted prisoner to assist can be very different in these two contexts. As several circuits have recognized, the implications of and risks attending grievances are often greater than those involved in lawsuits. *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004) (observing that "threats or other intimidation by prison officials may well deter a prisoner . . . from filing an internal grievance, but not from appealing directly to . . . external structures of authority such as state or federal courts" because "filing a civil rights complaint may enable an inmate to draw outside attention to his complaints, thereby neutralizing threatened retaliatory conduct from prison employees."); *see also Turner v. Burnside*, 541 F.3d 1077, 1085-86 (11th Cir. 2008) (quoting *Hemphill* with approval); *Kaba v. Stepp*, 458 F.3d 678, 684-85 (7th Cir. 2006) (quoting

28

*Hemphill* with approval). In the absence of any affirmative evidence that help in filing a grievance about the attack was actually available to Sheltra, summary judgment on this point is inappropriate. At most, the fact that another prisoner drafted a court filing for him creates a triable issue as to unavailability. *Kaba*, 458 F.3d at 681.

## CONCLUSION

For the foregoing reasons and those in the opening brief, this Court should reverse the district court's grant of summary judgment as to Mr. Sheltra's individual-capacity claims and remand for further adjudication.

Dated: March 8, 2024

Respectfully submitted,

By: /s/ Aaron Littman

**UCLA SCHOOL OF LAW**
**PRISONERS' RIGHTS CLINIC**
AARON LITTMAN
385 CHARLES E. YOUNG DRIVE E
LOS ANGELES, CALIFORNIA 90095
(310) 825-9562
littman@law.ucla.edu

*Counsel for Plaintiff-Appellant*
*Shawn Sheltra*

29

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32 and 9th Circuit Rule 32, I certify that:

This brief complies with the type-volume limitation of 9th Circuit Rule 32-1(a) because this brief contains 6,840 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

/s/ Aaron Littman
Aaron Littman

**CERTIFICATE OF SERVICE**

I certify that on March 8, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Aaron Littman
Aaron Littman